**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 4, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 01-40851
_____

CIRO CID ADAMES,

Plaintiff-Appellee,

versus

ORLANDO PEREZ; ET AL,

Defendants,

ORLANDO PEREZ; WILLIAM A. BOOTHE, ROBERT CRITES,

Defendants-Appellants.

Appeal from the United States District Court
For the Southern District of Texas

Before HIGGINBOTHAM, EMILIO M. GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Ciro Cid Adames ("Adames"), a Texas state prisoner, brought suit against five prison officials

pursuant to 42 U.S.C. § 1983. Adames claimed that the officials violated his eighth amendment right

to be free from cruel and unusual punishment because they failed to protect him from an attack by

another inmate. A jury determined that two of the defendant prison officials (Antonio Garcia and Abigail Villareal) did not violate Adames' rights. The jury, however, found that the other three officials (Orlando Perez, William Boothe, and Robert Crites) were liable for failing to protect Adames. The jury awarded Adames $30 in compensatory damages and $70,000 in punitive damages. The three prison officials filed this appeal. Because we conclude that Adames failed to offer any evidence to support the jury's verdict, we vacate the judgment and remand for a new trial. *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 573-74 (5th Cir. 2002).

I

Adames was incarcerated at the McConnell Unit of the Texas Department of Criminal Justice in Beeville, Texas. Because of his affiliation with the Texas Syndicate, a prison gang, Adames was placed in administrative segregation housing (a section of the prison reserved for the more dangerous inmates). Prisoners in administrative segregation are housed in individual cells, and are confined to those cells for most of the day. They are allowed to leave their cells for only one hour each day to engage in recreational activities and to take showers. Only one prisoner is supposed to leave his cell at any given time. When the prisoners in administrative segregation leave their cells, they must be accompanied by at least one, and often two, correctional officers.

During the summer of 1997, Adames began to have second thoughts about his gang membership. He had already acquired his General Education Degree ("GED") and had begun to take college courses, in an effort to prepare himself for life outside of prison. That fall, in order to increase his chances for parole, Adames decided to inform Captain Richard Crites ("Captain Crites")[1] about

---

[1] Captain Crites was later promoted to the level of "major." Because he was a captain at the time of the events relevant to this case, this opinion refers to him as "Captain Crites."

some illegal activities involving Adames's prison gang. Adames told Crites that some prison guards were smuggling drugs int o the prison on behalf of the Texas Syndicate. A few weeks after that conversation, Adames was attacked by another member of the gang.

On the day of the attack, Adames was handcuffed and escorted back from the showers to his cell by Officer Abigail Villareal ("Officer Villareal"). Another prison guard, Officer Antonio Garcia ("Officer Garcia"), stood by Adames's cell, preparing to open the cell door. Before Officer Villareal and Adames could proceed to Adames's cell, however, they were ambushed by inmate Jesse Lopez ("Lopez"), a fellow member of the Texas Syndicate, who had escaped from his own cell. Lopez was carrying a weapon known as a "shank."

Lopez stabbed Adames multiple times. Because Adames was handcuffed, he was powerless to defend himself. Both Officer Garcia and Officer Villareal yelled to Lopez to cease his attack on Adames.[2] Lopez eventually complied with the officers' orders, but not until Adames had been badly injured by the shank. In less than one minute, Adames had been stabbed approximately thirteen times.

An investigation into the attack revealed how Lopez had escaped from his cell. Lopez was able to manipulate the locking mechanism on his cell door by using soap. During the investigation, officials discovered that, in three out of fourteen cells in the area, the locks on the cell doors were "jimmied" in a similar fashion.

The investigators also looked into the reason for the attack on Adames. Initially, Adames refused to cooperate with the investigation (apparently, out of a fear of retaliation by the Texas Syndicate). Eventually, Adames agreed to speak with the investigators, and asserted that the incident

_____

[2] The officers were reluctant to use a weapon, because prison regulations require that they employ the minimum force necessary to subdue an inmate.

arose out of a confrontation he had with Juan Farias, a respected leader (or "grandfather") of the Texas Syndicate. Adames claimed that the problem began when he refused to give Farias a stamp. Farias was offended by this refusal, and decided to label Adames a "snitch." Adames stated that the incident with the stamp was blown out of proportion and eventually led to the attack on Adames. Later on, Adames provided what he perceived to be the real reason for the attack: the Texas Syndicate discovered that he had given information to Captain Crites.

Adames subsequently filed suit against Officer Villareal, Officer Garcia, Captain Crites, Senior Warden Orlando Perez ("Warden Perez"), and Assistant Warden William Boothe ("Warden Boothe"), claiming that they violated his eighth amendment rights by failing protect him from the attack by Lopez. As noted above, the jury did not find any wrongdoing on the part of Officer Villareal or Officer Garcia. However, the jury found that Captain Crites, Warden Perez and Warden Boothe (or, collectively, "the prison officials") were responsible for failing to protect Adames. Only these latter prison officials have appealed.

II

The prison officials claim that the evidence was insufficient to support the jury's verdict. As the prison officials concede, because they failed to file a post-verdict motion for judgment as a matter of law challenging the sufficiency of the evidence, they waived their sufficiency claim. *See United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 960 (5th Cir. 1998). As a result, we must treat the sufficiency claim "'as being raised for the first time on appeal.'" *Delano-Pyle*, 302 F.3d at 573 (quoting *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996)). Therefore, we can review the claim only for plain error. *Id.* Under the plain error standard, we reverse a jury's verdict only if "the judgement works a manifest miscarriage of justice." *Id.* (internal quotation marks

omitted).  We examine whether there is *any* evidence to support the jury's verdict in favor of the plaintiff. *See id.*  If we determine that there is no evidence to support the verdict, we do not enter judgment for the defendant, but instead remand the case for a new trial on the merits.  *Id.* at 573-74; *see Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1315 (5th Cir. 1995) (observing that "[t]o fully preserve error on appeal," a party must be sure to file a motion for judgment as a matter of law both before and after a verdict, and that "[a]n appellant who failed to do so in the district court is not entitled to rendition of judgment in his favor on appeal, but is at most entitled to a new trial").

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  In particular, the Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other inmates.  *Id.*  Prison officials are not, however, expected to prevent all inmate-on-inmate violence.  *Farmer*, 511 U.S. at 834.  Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.  *See id.*

A prison official is deliberately indifferent if he knows of an "excessive risk to inmate health or safety" and disregards that risk.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The Court made clear that a prison official "knows of" an excessive risk only if (1) he is aware of facts from which he could infer "that a substantial risk of serious harm exists" and (2) he in fact "draw[s] the inference."  *Id.*  In other words, in order to be deliberately indifferent, a prison official must be *subjectively aware* of the risk.  *See id.* at 839-40.

In order to prove that an official is subjectively aware of a risk to inmate health or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge.  A plaintiff can rely on

-5-

circumstantial evidence indicating that the official must have known about the risk. *See Hope v. Pelzer*, 122 S. Ct. 2508, 2514 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"). For example, the plaintiff can produce circumstantial evidence that the risk to inmate health or safety was so longstanding and pervasive that the official must have been aware of this danger. *See Farmer*, 511 U.S. at 842-43.

In this case, the jury determined that Warden Perez, Warden Boothe, and Captain Crites were deliberately indifferent to a substantial risk that Adames (or a similarly situated prisoner) would be attacked by another inmate. Under the plain error standard, we must examine whether Adames produced any evidence to support the jury's determination.

Adames attempted to prove that the prison officials were aware of the risk in this case by highlighting other instances in which inmates had escaped their cells (and sometimes attacked other prisoners). Adames offered the testimony of two fellow prisoners (Mike Martinez and Gregorio Marquez) who had lived in the McConnell Unit. Martinez testified that, a year or two prior to the attack on Adames, Martinez was attacked by an inmate who had escaped from his cell. Martinez added that he knew of an another episode in which an inmate had exited his cell and stabbed a fellow prisoner. Marquez testified that, one day, when he was being escorted by a prison guard, Marquez watched an inmate escape from (and, within a few minutes, return to) his cell. As Martinez and Marquez acknowledged, neither Warden Perez, nor Warden Boothe, nor Captain Crites was involved in any of these incidents. Nor did Martinez and Marquez have any reason to believe that the prison officials were aware of these incidents. As a result, the inmates' testimony did not constitute direct

evidence that the officials knew about these (or similar) events. Thus, this testimony could help prove Adames's case only if it demonstrated that the problem of inmates escaping their cells was so pervasive that the three prison officials must have known about the danger. It is difficult to see how a few isolated incidents of inmates escaping their cells could constitute a "longstanding and pervasive" problem of which the prison officials must have been aware. Therefore, we conclude that the testimony of Martinez and Marquez does not shed any light on whether the prison officials were subjectively aware of a substantial risk of harm to Adames.

Adames also suggests that the prison officials must have been aware of a substantial risk because corrections officers at the McConnell Unit were not following the standard safety procedures. Officers were required to conduct cell searches on a regular basis and to check cell doors every half hour. Adames contends that the investigation into his attack (which revealed that inmates in several cells had manipulated the locks on their cell doors) demonstrated that at least some corrections officers were not conducting the required checks. Even assuming (for the sake of argument) that some officers were derelict in their duties, that evidence would not support the verdict against the prison officials. Adames failed to show that, prior to his attack, the prison officials were aware that any corrections officers had neglected to follow the safety regulations.[3]

Finally, Adames claims that the prison officials knew he was at risk of violence, because he was labeled in the prison files as a "potential victim." Brief of Appellee at 11. However, the evidence at trial showed that the designation "potential victim" means only that the prisoner was (at some point during his period of incarceration) involved in an altercation with another inmate. The designation

---

[3] We also note that prison officials cannot be automatically held liable for the errors of their subordinates. We have made clear that vicarious liability is an untenable theory of recovery in a § 1983 action. *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).

would not necessarily lead a prison official to conclude that the prisoner was at a substantial risk of serious harm in the future.[4]

Adames provided no additional evidence that Warden Perez was aware of a substantial risk of harm.[5] Adames thus failed to show that Perez was aware of *any* facts from which he could have inferred that Adames (or any similarly situated prisoner) was at risk. Therefore, we cannot sustain the jury's determination that Warden Perez was deliberately indifferent.

Adames claimed that Warden Boothe was aware of the risk that an inmate might escape his cell and attack another inmate at the McConnell Unit, because Boothe had received e-mail messages, stating that inmates in other prisons had managed to escape their cells.[6] Warden Boothe asserted, however, that these messages did not lead him to conclude that the inmates at the McConnell Unit were in any danger. Boothe was unaware of any incident at the McConnell Unit in which an inmate had escaped his cell. Boothe thus assumed that the e-mail messages were no cause for alarm: the inmates at the McConnell Unit would be adequately protected by the procedures already in place for securing cell doors (including cell searches and door checks).

---

[4] Apparently, Adames was identified as a potential victim because he had previously had difficulties with prisoners of other races. If so, then even if the label "potential victim" did signify that Adames faced serious harm, the designation would still not lead prison officials to conclude that Adames might be attacked by a member of his own gang (which appears to consist of individuals of the same race as Adames).

[5] Adames appears to argue that Warden Perez (as well as the other two prison officials) knew Adames was at risk because he had decided to leave his gang, and the prison officials knew that an inmate in that position could face retaliation. Adames, however, failed to present any evidence that Warden Perez (or Warden Boothe, for that matter) knew that Adames was attempting to extricate himself from his gang.

[6] Adames failed to produce any evidence that either Warden Perez or Captain Crites had read these e-mail messages.

Adames may have demonstrated at trial that Boothe *should have* inferred from the e-mail messages that inmates at the McConnell Unit might similarly escape from their cells. However, Adames failed to prove that Boothe *did* draw such an inference. At best, Adames may have shown that Boothe was negligent for failing to infer that inmates at the McConnell Unit were in danger (and for failing to institute additional procedures to protect them). However, negligence is insufficient to support a finding of liability. Adames had to show that Boothe was deliberately indifferent. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Because Adames failed to make such a showing, we cannot allow the verdict against Warden Boothe to stand. *See Rich v. Bruce*, 129 F.3d 336, 338, 340 (4th Cir. 1997) (reversing the district court's judgment in favor of a plaintiff inmate because the "district court . . . found only that [the defendant official] had actual knowledge of facts from which a reasonable person might have drawn the inference . . . not that [the official] actually drew [the] inference").

Finally, Adames asserts that Captain Crites knew that Adames might be targeted by his gang. When Adames told Captain Crites that prison guards were smuggling drugs for the Texas Syndicate, Adames became (in gang parlance) a "snitch." As all the prison officials agreed, an individual who divulges secret information about his gang might be a target of violence by fellow gang members.

However, in order to show that Captain Crites was aware of facts from which he could infer a substantial risk of serious harm, Adames could not simply demonstrate that Crites knew Adames divulged information about the Texas Syndicate. There would be no substantial risk to Adames's safety if Adames leaked information, and none of his fellow gang members found out. Adames would be in danger only if the Texas Syndicate learned that Adames had revealed information about the gang. Thus, Adames had to show that Captain Crites was aware of facts that could lead him to infer

-9-

that Adames' gang members had learned about the conversation between Crites and Adames.[7]

Adames claims that Captain Crites was aware of facts that could lead him to make the necessary inferences. Adames suggests that Captain Crites must have told others about his conversation with Adames, thereby allowing the Texas Syndicate members to discover (through the grapevine) that Adames was a "snitch." Adames thereby asserts not only that Crites knew about the risk to Adames's safety but also that Crites helped create that risk. We agree that a prison official acts with deliberate indifference if he helps create a risk to an inmate's health or safety. *See Cantu*, 293 F.3d at 843-45 (upholding a jury verdict against prison officials in a case where the plaintiff claimed that the officials deliberately permitted another inmate to escape his cell and attack the plaintiff). Indeed, Captain Crites conceded that, if he had informed others about his conversation with Adames, that would be an act of deliberate indifference to Adames's safety. Adames, however, failed to provide *any* evidence to support his theory that Crites told anyone about their conversation.[8]

---

[7] Similar reasoning applies to Adames's suggestion that Captain Crites must have known Adames was at risk because he planned to extricate himself from the Texas Syndicate (and, thus, might face retaliation from the gang). *Cf. supra* note 5. It is true that Captain Crites might have known (based on his conversation with Adames) that Adames was attempting to leave his gang. However, Captain Crites would have had no reason to conclude that Adames was in danger unless Crites also knew that the Texas Syndicate was aware of Adames's decision. Adames presented no evidence that Captain Crites had this additional knowledge.

[8] To prove that Captain Crites informed the Texas Syndicate about their conversation, Adames relies on the testimony of Lopez (his attacker). At trial, counsel for Adames asked Lopez if Captain Crites had revealed to him that Adames leaked information about the Texas Syndicate. Lopez refused to answer, asserting his fifth amendment right against self-incrimination. Lopez then stated that he would refuse to answer (also on fifth amendment grounds) any question posed by Adames's counsel. We fail to see how Lopez's assertion of his fifth amendment rights constitutes "evidence" that Captain Crites divulged his conversation with Adames.

At trial, Adames also indicated that an incident that occurred after his conversation with Captain Crites (but before the attack by Lopez) led Adames to wonder if the Texas Syndicate had learned about the conversation. Adames testified that he saw a sergeant of the general population

Nor did the evidence produced at trial allow the jury to infer that Crites must have told someone that Adames had leaked information. The jury could make such an inference only if Adames's conversation with Crites was the sole explanation for the attack. However, there were other explanations. Adames testified that, by the summer prior to the attack, he was planning to extricate himself from his gang. If Adames' fellow gang members learned of his intentions, that alone might explain their decision to attack him. Adames also told the officials who initially investigated the attack that he had offended the "grandfather" of the Texas Syndicate by failing to give that individual a stamp. That incident provided another alternative explanation for the attack on Adames. Because the evidence at trial provided other explanations for the attack, it would have been unreasonable for the jury to infer that Captain Crites told the Texas Syndicate about his conversation with Adames. Such an inference would be based solely on speculation.

Adames failed to produce any evidence demonstrating that the prison officials were subjectively aware that Adames (or a similarly situated prisoner) faced a substantial risk of serious harm. Therefore, he failed to produce evidence to support the jury's verdict that the prison officials were deliberately indifferent. As a result, we must vacate the judgment below, and remand for a new trial.

VACATED and REMANDED.

---

enter the administrative segregation area and speak to a Texas Syndicate member. Adames, however, provided no evidence that this incident was at all related either to his conversation with Captain Crites or to the subsequent attack. Indeed, Adames admitted at trial that he had no reason to suspect that this incident was related to the attack.