# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2014

Lyle W. Cayce
Clerk

No. 12-60933

SAMUEL T. WILLIAMS, Individually; KOURTNEY BYNUM, Individually; DONALD REED, SR., Individually and on Behalf of the Wrongful Death Beneficiaries of Donald Reed, Jr.; JUDY THOMPSON, Individually and on Behalf of the Wrongful Death Beneficiaries of Donald Reed, Jr.,

> Plaintiffs – Appellees

v.

SHARON HAMPTON,

> Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:08-CV-163

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:*

Sharon Hampton, a Mississippi state correctional officer, appeals the judgment of the district court holding her liable in a § 1983 action for the death of one inmate and the injuries of two other inmates. A jury found that Hampton had violated the Eighth Amendment rights of the inmates by acting with deliberate indifference to a substantial risk of serious harm. Hampton

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60933

argues that the evidence was insufficient to show that she acted with deliberate indifference or that her actions caused the harm to the inmates. She also argues that she is entitled to qualified immunity. For the following reasons, we AFFIRM the judgment of the district court.

## BACKGROUND

This case arises out of an inmate-on-inmate attack that occurred on July 25, 2007, in Unit 32 of the Mississippi State Penitentiary in Parchman, Mississippi. Although Unit 32 has since been closed, at that time it contained the prison's maximum security unit and death row. Among the inmates housed in Unit 32 were gang members, inmates considered too violent to be in the general population, inmates who had committed serious rule violations, and mentally ill inmates. Unit 32 inmates were given one hour of outdoor exercise time each day, known as "yard call," which took place on the yard in a series of individual pens.[1] During that hour, each inmate would be placed alone in a locked 180-square-foot outdoor pen surrounded by a metal fence.

Although the testimony introduced at trial is unclear and contradictory with respect to many of the details of the events of July 25, 2007, the facts, as construed in the light most favorable to the verdict, are as follows: At some time in the morning of July 25, 2007, Hampton was guarding the Building B yard in Unit 32 while inmates were in the pens for yard call. Hampton was carrying a block gun, which, unbeknownst to her, was not loaded.[2] She was also carrying the keys to the pens and two extra block gun rounds. Samuel Williams, an inmate who was in one of the pens for yard call, demanded that

---

[1] There were multiple buildings in Unit 32. Building B, where the incident giving rise to this case occurred, had 28 associated pens.

[2] A block gun is a 37mm single-shot, break-open gun that shoots a large rubber slug. It is the only type of firearm carried by guards inside the prison.

No. 12-60933

Hampton bring him a money withdrawal slip and stated that he would not leave the yard until he received it. Hampton asked Lieutenant Taylor to relieve her on the yard so that she could go inside to get the paperwork. Hampton gave Taylor the keys and the block gun, but did not give him the extra rounds.

After Hampton left the yard, two inmates, Lester Nash and Derrick Hayes, managed to break out of their pens and acquire weapons.[3] Nash and Hayes ran toward Taylor with weapons in hand. Taylor, who was sitting on a milk crate, jumped up, dropping his keys in the process. Taylor pointed the block gun at Nash and Hayes and told them not to move, which caused them to stop. However, for reasons that are not clear, Taylor began to back away and eventually ran into the nearby building. Nash picked up the keys and used them to let five other inmates out of their pens. The seven escaped inmates, who were armed with shanks and with a heavy piece of iron, then began to attack three other inmates. They unlocked the pens of Donald Reed, Jr., Kourtney Bynum, and Samuel Williams, and repeatedly stabbed and beat the three men. Reed died from his injuries, and Bynum and Williams both sustained severe injuries requiring extended medical treatment. Hampton was suspended for ten days without pay for failing to examine the block gun to ensure that it was loaded and for failing to turn over the extra rounds to Taylor. These actions were found to constitute a Group 3 violation, *i.e.*, a rule violation involving a threat to human life or safety.

Bynum, Williams, and Reed's parents (as wrongful death beneficiaries) brought an action under 42 U.S.C. § 1983, alleging violations of the Eighth Amendment. The plaintiffs sued Christopher Epps, the Commissioner of the

---

[3] Nash and Hayes both had shanks, *i.e.*, knife-like weapons made from any available materials.

3

No. 12-60933

Mississippi Department of Corrections ("MDOC"); Taylor; Hampton; and four other correctional officers (George Davenport, Dennis Profit, Milton McGee, and Marvin Johnson).   Taylor, Profit, and McGee, who were no longer employed by the MDOC, defaulted.  The claims against Epps and Johnson were voluntarily dismissed by the plaintiffs.   The remaining claims against Hampton and Davenport were tried before a jury.  The district court granted a directed verdict in favor of Davenport at the close of evidence, but denied Hampton's motion for a directed verdict.  The jury found Hampton liable and awarded $25,000 to Bynum; $25,000 to Williams; and $100,000 to Reed's parents.  After rejecting Hampton's post-trial motion for judgment as a matter of law, the district court entered judgment (presumably jointly and severally) against Hampton and the three defaulted defendants for a total of $150,000.

Hampton now appeals, arguing the district court erred in denying her motion for judgment as a matter of law.  She argues that her actions did not amount to deliberate indifference and therefore did not violate the Eighth Amendment; that her actions did not cause the plaintiffs' injuries; and that she is entitled to qualified immunity.

## DISCUSSION

A district court's denial of a motion for judgment as a matter of law is reviewed *de novo*.  *Thomas v. Tex. Dept. of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000).  "A post-judgment motion for judgment as a matter of law should only be granted when 'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'"  *Id.* (quoting *Waymire v. Harris County*, 86 F.3d 424, 427 (5th Cir. 1996)).  "We accord great deference to the jury's verdict when evaluating the sufficiency of the evidence, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the verdict."  *Id.* (citation omitted).

4

## I.    DELIBERATE INDIFFERENCE

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation omitted).  However, "[p]rison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).  "Deliberate indifference" means that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

Hampton first argues that her failure to provide Taylor with ammunition for the block gun is "simple negligence" that cannot constitute deliberate indifference.  However, Hampton's testimony at trial undercuts her argument that this failure was accidental.  Hampton stated:

> . . . It was my mistake that I didn't check the gun.  And when – the reason – I handed the gun over to Lieutenant Taylor. The reason I came off the yard, because Samuel Williams said that he wasn't going to come off the yard until he got a money withdrawal slip from the case manager.
>
> And by me giving Lieutenant Taylor the gun, I had the two bullets in my pocket, because I thought that I was going to run in the case manager's office, which would take about a minute or two, and come back out.

Hampton further stated: "I handed Lieutenant Taylor the gun and the keys, and thinking that I'm going to come back out in less than a minute or two, I

took the rounds with me." Similarly, Hampton testified that she did not check the block gun for ammunition because she assumed it was loaded. A reasonable jury could infer from this language that Hampton's actions were deliberate rather than accidental or involuntary.

Hampton next argues that no evidence was presented showing that she was actually aware of a substantial risk of serious harm to inmates. Although no direct evidence of Hampton's mental state was presented, there was no shortage of evidence of the conditions in Unit 32. Commissioner Epps testified that Unit 32 was "a dangerous place" at the time of the incident. He further testified that Unit 32 housed "core members" of rival gangs, making violence essentially inevitable. He testified that rival gangs fought each other "all the time," and that inmates would fashion weapons out of nearly any available materials. He explained that although Unit 32 was built with an open outdoor exercise area, individual pens had to be installed because inmates "kept fighting and stabbing each other." He also explained that officers "always [had] to be on [their] Ps and Qs" because some inmates were able to escape from even double-locked handcuffs. Regarding the attack on Reed, Williams, and Bynum, Commissioner Epps opined that "the incident was going to happen either on the pens or somewhere else."

Ricky Scott, a Security Threat Group Coordinator for the MDOC, testified that Reed, Williams, and Bynum had been attacked pursuant to a "war" between rival gangs. Scott testified that inmates would "try[] to beat the security whichever way they can" in order to attack other inmates. Lawrence Haefeli, an expert witness called by the plaintiffs, explained many of the factors that gave rise to a particularly dangerous situation in Unit 32. Finally, Hampton was found guilty of a Group 3 violation, which reflected the belief of prison officials that her actions had threatened human life or safety.

No. 12-60933

From these facts, a rational jury could infer that Hampton, who had been working as a correctional officer at Parchman for approximately eight years, was aware of a high risk of inmate-on-inmate violence in Unit 32. A rational jury could also infer that Hampton was aware that leaving Lieutenant Taylor alone to guard the exercise pens without any block gun ammunition (and therefore without any effective way to resist escaped inmates) presented a substantial risk of serious harm.[4] Viewed in the light most favorable to the verdict, the evidence showed that Unit 32 housed the most dangerous inmates in the Mississippi prison system, some of whom were both highly motivated to attack other inmates and determined to thwart the prison's security measures. In such a situation, where escape is a constant threat, backup measures for stopping escaped inmates are particularly important.

Hampton argues that there was "no evidence of a 'longstanding and pervasive' risk of harm at the single-person exercise pens where this attack occurred." Such specificity is not required, however. If Unit 32 inmates are generally at risk of attack by fellow inmates, this risk would seem to be just as present in the outdoor exercise pens. Hampton identifies no reason why the threat would be reduced in the outdoor exercise pens, and the evidence presented at trial suggests, if anything, the opposite.

---

[4] The dissent notes the absence of any evidence showing that Hampton knew the block gun was unloaded and suggests that she was merely negligent in handing over the block gun without verifying that it was loaded. However, the evidence suggests that she consciously disregarded the risk that the gun might not be loaded, which is better characterized as recklessness. In any event, even if Hampton was merely negligent in failing to check the block gun for ammunition, her testimony clearly shows that her failure to give Taylor the extra rounds was deliberate. Therefore, even in the best case Hampton knew that she was leaving Taylor with at most one block gun round to guard numerous inmates. This scenario would also support the jury's determination that Hampton was deliberately indifferent to a substantial risk of serious harm.

## II.  CAUSATION

Hampton also argues that, even assuming she was deliberately indifferent to a substantial risk of serious harm, her actions did not cause Reed's death or Williams' and Bynum's injuries.  Hampton contends that "even if [she] had given [Lieutenant] Taylor a loaded block gun and an unlimited supply of ammunition, this attack would have still occurred as [Lieutenant] Taylor dropped the keys to the exercise pens and ran inside the prison."  Accordingly, Hampton argues that "Taylor's failure to secure the keys to the exercise pens was the superseding cause" of the harm to the plaintiffs.

As Hampton notes, there is no direct evidence showing that Taylor ever attempted to fire the block gun or realized that the gun was unloaded.  However, based on the evidence presented, the jury could have rationally inferred that but for Hampton's failings, the attack would have been thwarted.  Although Taylor initially pointed his gun at the two escaped inmates and succeeded in stopping their advance, he ultimately chose to retreat for reasons that are unknown.  He may have attempted to fire the gun and discovered that it was unloaded.  Alternately, he may have assumed the gun was loaded but realized that he had no extra ammunition, leaving him with at most one round to stop two armed inmates.  While there are of course other possible explanations for Taylor's actions, both of the explanations above are plausible.  Furthermore, assuming it was lack of ammunition that caused Taylor to flee in fear and panic, it would hardly be surprising for this same fear and panic to prevent him from picking up the dropped keys before running away.  Causation is an "intensely factual" question, *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999) (quotation omitted), and we cannot say that the jury's finding on this issue was irrational or entirely without evidentiary support.

### III.  QUALIFIED IMMUNITY

After the plaintiffs rested at trial, Hampton moved for a directed verdict, arguing that her actions constituted negligence at worst and did not rise to the level of deliberate indifference.  However, Hampton made no argument relating to qualified immunity.  At the close of evidence, Hampton renewed her motion for a directed verdict on the same grounds, and again did not mention qualified immunity.  The jury was instructed on the defense of qualified immunity, and was told that Hampton is not liable if "her conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident in issue."  After the jury returned its verdict, Hampton moved for judgment as a matter of law, arguing that her actions "amount[ed] to no more than simple negligence," that she was not subjectively aware of any substantial risk of serious harm, and that her actions did not cause the harm to the plaintiffs.  Once again, she made no argument relating to qualified immunity.  Accordingly, because Hampton did not raise the issue of qualified immunity before the district court, we review for plain error.

To demonstrate plain error, an appellant must show an error that is clear or obvious and that affected her substantial rights.  *Puckett v. United States*, 556 U.S. 129, 135 (2009).  If the appellant makes such a showing, this court has the discretion to remedy the error, but should do so only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

In Hampton's appellant brief, she argues that it would not have been clear to a reasonable officer that failing to give Lieutenant Taylor ammunition for the block gun was a violation of federal law.  Specifically, she contends that "[s]uch is a violation of MDOC protocol, but is not clearly 'unlawful' to a reasonable officer."  Hampton correctly notes that "[v]iolations of non-federal laws cannot for a basis for liability under § 1983."  However, Hampton's

liability here is not based on a violation of MDOC protocol – it is based on a violation of the plaintiffs' federal constitutional rights under the Eighth Amendment.  In Hampton's reply brief, she argues for the first time that her actions were "objectively reasonable" in light of clearly established law at the time.  However, Hampton does not cite even a single case setting forth the relevant legal standard for failure to protect an inmate from attack by other inmates.  In short, Hampton has not shown that the district court committed any clear or obvious error in denying judgment as a matter of law based on qualified immunity.

## CONCLUSION

For the reasons explained above, we AFFIRM the judgment of the district court.

No. 12-60933

PRISCILLA R. OWEN, Circuit Judge, dissenting:

I respectfully dissent.  The majority opinion incorrectly applies the law governing claims that a prison official was deliberately indifferent to the safety of inmates.  The majority opinion also supports its conclusion that there was evidence of deliberate indifference with non-existent "facts" that the Plaintiffs did not even *allege*, must less prove.

## I

With great respect, the majority opinion does not adhere to the Supreme Court's and our precedent regarding an inmate's claim that a prison official violated the Eighth Amendment by failing to protect a prisoner from harm inflicted by other inmates.  An official's knowledge of the risk of harm posed by a history of inmate-on-inmate violence at this prison does not, standing alone, constitute evidence from which a jury may infer deliberate indifference under the facts of this case.  This is not a case in which an inmate is claiming that he should not have been placed in the general population of violent offenders.[1] The allegations before us revolve around an unloaded block gun.  There must be evidence that the official had subjective knowledge of the risk of harm presented by her own acts and omissions regarding the block gun.  There was no such evidence, and consequently, the majority opinion improperly equates negligent acts and omissions with deliberate indifference.  The majority opinion's reasoning permits liability to be imposed on a corrections officer whenever that individual knows that he or she is working in a prison that has a history of inmate-on-inmate violence and whose negligence contributes to a situation in which inmates are attacked by other prisoners.

---

[1] *Cf. Farmer v. Brennan*, 511 U.S. 825, 849 (1994) (remanding for further factual development when a transsexual asserted that each defendant had knowledge that the prison "was and is, a violent institution with a history of sexual assault, stabbings, etc., [and that] each defendant showed reckless disregard for [his] safety by designating [him] to [the] institution knowing that [he] would be sexually assaulted").

No. 12-60933

Additionally, the majority opinion's reasoning has no evidentiary support. The opinion says that a "jury could also infer that Hampton *was aware* that leaving Lieutenant Taylor [Hampton's supervisor] alone to guard the exercise pens without any block gun ammunition . . . presented a substantial risk of serious harm."[2] However, there was no evidence—none whatsoever—that Hampton knew that the block gun was unloaded when she left Taylor alone for what she thought would be a minute or two. The majority opinion correctly acknowledges earlier, in its recitation of the factual background of this case, that Hampton was unaware that she was carrying an unloaded block gun[3] and that Hampton testified that she did not check the block gun for ammunition because she assumed that it was loaded.[4] Her supervisor, Lieutenant Taylor, had been on yard duty, in possession of the block gun, for quite some time before Hampton reported for duty at the prison. Taylor gave the block gun to Hampton when she relieved him of yard duty while they were standing in the yard itself. She assumed that the block gun was loaded, and thereafter, she was on duty in the prison yard with an unloaded block gun before she gave the gun back to Taylor while she retrieved a money withdrawal slip that one of the plaintiffs in this case asked her to get for him. There is no evidence that Hampton was subjectively aware that the block gun was unloaded or from which the jury could infer that Hampton was subjectively aware that the gun was unloaded. Indeed, the Plaintiffs have not argued that Hampton knew the block gun was unloaded. The *only* arguments that the Plaintiffs make in their briefing before this court are that

- "Hampton inexplicably failed to ascertain that she was holding an empty block gun throughout her shift on yard call."

---

[2] *Ante* at 7 (emphasis added).

[3] *Ante* at 2.

[4] *Ante* at 5.

12

No. 12-60933

- "Further, when she decided to leave the yard on a 'quick' errand, she failed to check the block gun she turned over to the Defendant Taylor, thus handing him an unloaded weapon, and failed to give him any ammunition for the block gun."

- "[T]he Plaintiffs' expert in corrections unequivocally concluded that the Defendant Hampton's failure to check the block gun, her relinquishing of an empty block gun to the Defendant Taylor and her taking the ammunition for the block gun with her violated correctional standards and created a substantial risk of serious harm amounting to deliberate indifference."

There is absolutely no evidence from which a jury could reasonably infer that Hampton knew that she had left Taylor on yard duty with an unloaded block gun.  Hampton's failure to check the block gun and her failure to return to Taylor the two rounds of ammunition that he had given her earlier in the day were negligent acts or omissions, but they do not, as a matter of law, rise to the level of deliberate indifference.

**I**

In order for an inmate to prevail on an Eighth Amendment failure-to-protect claim, he must demonstrate that "he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection."[5]  This is an "extremely high standard to meet."[6]   The prisoner must demonstrate that the officer was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," that the officer in fact drew such an inference, and that the officer nevertheless disregarded the risk.[7]   This standard "describes a state of mind more blameworthy than negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of

---

[5] *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999).

[6] *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

[7] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

causing harm or with knowledge that harm will result."[8]  The Supreme Court has defined this standard as equivalent to recklessness, in which "a person disregards a risk of harm of which he is aware."[9]  An inmate can prove awareness of the risk with circumstantial evidence that "the risk to inmate health or safety was so longstanding and pervasive that the official must have been aware of this danger."[10]  However, the fact that there had been a history of inmate-on-inmate violence in Unit 32 and that Hampton was aware of this danger does not translate into evidence that she knew she had left Lieutenant Taylor with an unloaded block gun or that she acted recklessly in failing to ascertain that the gun was unloaded.  The Supreme Court has admonished that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."[11]

## II

Lieutenant Taylor was Hampton's supervisor.  He was on yard duty before Hampton reported for work at the prison on the day in question and was in possession of the block gun.  Hampton testified, without contradiction, that Taylor should have checked the block gun to ensure that it was loaded before the first inmate was allowed to leave the indoor area and was brought to an individual outdoor pen or cage.  The block gun was capable of holding one round of ammunition, which consisted of a rubber slug.  There were three rounds of rubber slugs for the block gun that the guard on duty would have.  When Hampton relieved Taylor of yard duty, Taylor handed the block gun to her and gave her two rounds of the rubber ammunition.  Hampton testified that this

---

[8] *Id.* at 835.

[9] *Id.* at 836-37.

[10] *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

[11] *Farmer*, 511 U.S. at 838.

caused her to assume that there was at least one round of ammunition in the block gun. She remained on yard duty until the time for the inmates to be taken back indoors had come, not knowing that the block gun was unloaded. One of the Plaintiffs, Samuel Williams, told Hampton that he would not leave his outdoor pen until Hampton brought him a money withdrawal slip from the case manager. Hampton left the yard to obtain this document, and Lieutenant Taylor reassumed yard duty. As Hampton left the yard, she handed the block gun to Taylor and thought that she would be inside no longer than a minute or two to get a withdrawal slip. She did not return to Taylor the two rounds of ammunition that he had given to her earlier in the day. The escape of two inmates from their individual outdoor pens occurred just after Hampton went inside.

When the two escaped inmates ran toward Taylor, he threw the block gun at them, then retreated inside. In the process of doing so, he dropped the keys to the outside pens onto the ground. Two inmates who were confined in their respective pens and who feared that they would be attacked by the escaped inmates begged Taylor to pick up the keys before he left the yard, but Taylor did not do so. The two inmates who had escaped retrieved the keys and released five other inmates from their respective pens. These seven escaped inmates attacked other inmates, stabbing and beating them, using the keys that Taylor had dropped to open the pens. One prisoner was killed; others were seriously injured. The surviving inmates, joined by the family of the murdered inmate, sued various prison officials, including Hampton. At the conclusion of a trial, a jury found that Hampton was deliberately indifferent to the safety of the inmates who were attacked.

As already discussed, there is no evidence that Hampton knew that the block gun was unloaded. The majority opinion concludes that even so, Hampton acted with deliberation because she knew when she left the yard that

she had two of the three rubber slugs in her pocket and did not return them to Taylor.  But knowledge that she had two of the rubber slugs, presumably leaving Taylor with only one, does not rise to recklessness, which can constitute deliberate indifference, particularly given the facts of this case.  Hampton's act or omission in taking two slugs with her may have been negligence, but it is not deliberate indifference to the risk that inmates will attack other prisoners. The evidence at trial was that a guard should not even check to see if the block gun was loaded if the guard was given the gun while on the yard because "if you open that block gun up and you mess around and pop out a projectile, you make yourself vulnerable as it relates to the inmates."  Further, there is no evidence that Hampton consciously perceived that there was a substantial risk that Taylor would be rushed by two escaped prisoners and would be placed in a more precarious position by having only one round of ammunition, since, had he had the two rounds of ammunition that Hampton had with her, opening up the block gun to reload after each shot fired would be time-consuming and perhaps impossible under the circumstances Taylor faced.  The majority opinion demands near-perfect foresight from prison guards like Hampton.  It also assumes that had Taylor just had the two rounds of ammunition that Hampton took back inside with her, Taylor could have ascertained that the block gun was unloaded as the escaped prisoners charged him, loaded it, fired a shot, or perhaps reloaded and fired two shots, and stopped the escaped inmates.  This, the majority opinion says, is the risk of which Hampton was consciously aware and to which Hampton was deliberately indifferent.

The Supreme Court explicated the basis for an official's liability when an inmate harms another prisoner in *Farmer v. Brennan*.[12]  Liability may be

---

[12] 511 U.S. 825 (1994).

imposed when "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."[13]  The Court expressly "reject[ed] [the] invitation to adopt an objective test for deliberate indifference."[14]  The Court "define[d] the term 'deliberate indifference' . . . by requiring a showing that the official was subjectively aware of the risk."[15]  That required showing is lacking in this case.  There is no evidence that Hampton was subjectively aware of the risk that her conduct posed for the inmates who were attacked.

The Supreme Court explained in *Farmer v. Brennan* that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[16]  The Plaintiffs failed to adduce evidence that satisfies this requirement.  They have only produced evidence that Hampton failed to alleviate a significant risk that she should have perceived but did not.  This falls squarely within a range of conduct that the Supreme Court has said will not suffice to prove deliberate indifference:  "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."[17]

Hampton admitted to making mistakes.  The majority opinion points out that she was reprimanded for these mistakes.  She was found to have committed a Group 3 violation, which indicates that her actions had

---

[13] *Id.* at 828.
[14] *Id.* at 837.
[15] *Id.* at 829.
[16] *Id.* at 837.
[17] *Id.* at 838.

threatened human life and safety, and she was suspended for ten days. This is not evidence that she was deliberately indifferent. First, a violation of prison policy "is insufficient by itself to support an argument for deliberate indifference."[18] Second, although her actions may have contributed to the endangerment of human life and safety, and an inmate was killed and others were injured that day, that is not the test.

Hampton's actions and omissions do not constitute deliberate indifference. No reasonable jury could have concluded from the evidence presented at trial that Hampton consciously disregarded the risk of inmate-on-inmate harm when she relinquished yard duty to her superior officer, Lieutenant Taylor. There were steps Hampton should have taken, and she admitted at trial that she should have taken them. But § 1983 claims for damages against prison officials must be made of sterner stuff.[19] Admissions of negligence will not suffice. Hampton was entitled to judgment notwithstanding the verdict.

---

[18] *Longoria v. Texas*, 473 F.3d 586, 593 n.9 (5th Cir. 2006).

[19] *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Adames v. Perez*, 331 F.3d 508, 514 (5th Cir. 2003) ("[N]egligence is insufficient to support a finding of liability."). *See also Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Daniels v. Williams*, 474 U.S. 327, 329-30 (1986); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648 (5th Cir. 1996).