PER CURIAM: *
Sharon Hampton, a Mississippi state correctional officer, appeals the judgment of the district court holding her liable in a § 1983 action for the death of one inmate and the injuries of two other inmates. A jury found that Hampton had violated the Eighth Amendment rights of the inmates by acting with deliberate indifference to a substantial risk of serious harm. Hampton argues that the evidence was insufficient to show that she acted with deliberate indifference or that her actions caused the harm to the inmates. She also argues that she is entitled to qualified immunity. For the following reasons, we AFFIRM the judgment of the district court.
BACKGROUND
This case arises out of an inmate-on-inmate attack that occurred on July 25, 2007, in Unit 32 of the Mississippi State Penitentiary in Parchman, Mississippi. Although Unit 32 has since been closed, at that time it contained the prison’s maximum security unit and death row. Among the inmates housed in Unit 32 were gang members, inmates considered too violent to be in the general population, inmates who had committed serious rule violations, and mentally ill inmates. Unit 32 inmates were given one hour of outdoor exercise time each day, known as “yard call,” which took place on the yard in a series of individual pens.[1] During that hour, each inmate would be placed alone in a locked 180-square-foot outdoor pen surrounded by a metal fence.
Although the testimony introduced at trial is unclear and contradictory with respect to many of the details of the events of July 25, 2007, the facts, as construed in the light most favorable to the verdict, are as follows: At some time in the morning of July 25, 2007, Hampton was guarding the Building B yard in Unit 32 while inmates were in the pens for yard call. Hampton was carrying a block gun, which, unbeknownst to her, was not loaded.[2] She was also carrying the keys to the pens and two extra block gun rounds. Samuel Williams, an inmate who was in one of the pens for yard call, demanded that Hampton bring him a money withdrawal slip and stated that he would not leave the yard until he received it. Hampton asked Lieutenant Taylor to relieve her on the yard so that she could go inside to get the paperwork. Hampton gave Taylor the keys and the block gun, but did not give him the extra rounds.
*196 After Hampton left the yard, two inmates, Lester Nash and Derrick Hayes, managed to break out of their pens and acquire weapons.[3] Nash and Hayes ran toward Taylor with weapons in hand. Taylor, who was sitting on a milk crate, jumped up, dropping his keys in the process. Taylor pointed the block gun at Nash and Hayes and told them not to move, which caused them to stop. However, for reasons that are not clear, Taylor began to back away and eventually ran into the nearby building. Nash picked up the keys and used them to let five other inmates out of their pens. The seven escaped inmates, who were armed with shanks and with a heavy piece of iron, then began to attack three other inmates. They unlocked the pens of Donald Reed, Jr., Kourtney Bynum, and Samuel Williams, and repeatedly stabbed and beat the three men. Reed died from his injuries, and Bynum and Williams both sustained severe injuries requiring extended medical treatment. Hampton was suspended for ten days without pay for failing to examine the block gun to ensure that it was loaded and for failing to turn over the extra rounds to Taylor. These actions were found to constitute a Group 3 violation, i.e., a rule violation involving a threat to human life or safety.
Bynum, Williams, and Reed’s parents (as wrongful death beneficiaries) brought an action under 42 U.S.C. § 1983, alleging violations of the Eighth Amendment. The plaintiffs sued Christopher Epps, the Commissioner of the Mississippi Department of Corrections (“MDOC”); Taylor; Hampton; and foul’ other correctional officers (George Davenport, Dennis Profit, Milton McGee, and Marvin Johnson). Taylor, Profit, and McGee, who were no longer employed by the MDOC, defaulted. The claims against Epps and Johnson were voluntarily dismissed by the plaintiffs. The remaining claims against Hampton and Davenport were tried before a jury. The district court granted a directed verdict in favor of Davenport at the close of evidence, but denied Hampton’s motion for a directed verdict. The jury found Hampton liable and awarded $25,000 to Bynum; $25,000 to Williams; and $100,000 to Reed’s parents. After rejecting Hampton’s post-trial motion for judgment as a matter of law, the district court entered judgment (presumably jointly and severally) against Hampton and the three defaulted defendants for a total of $150,000.
Hampton now appeals, arguing the district court erred in denying her motion for judgment as a matter of law. She argues that her actions did not amount to deliberate indifference and therefore did not violate the Eighth Amendment; that her actions did not cause the plaintiffs’ injuries; and that she is entitled to qualified immunity.
DISCUSSION
A district court’s denial of a motion for judgment as a matter of law is reviewed de novo. Thomas v. Tex. Dept, of Criminal Justice, 220 F.3d 389, 392 (5th Cir.2000). “A post-judgment motion for judgment as a matter of law should only be granted when ‘the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.’ ” Id. (quoting Waymire v. Harris County, 86 F.3d 424, 427 (5th Cir.1996)). “We accord great deference to the jury’s verdict when evaluating the sufficiency of the evidence, viewing all the evidence and drawing all reasonable infer- *197 enees in the light most favorable to the verdict.” Id. (citation omitted).
I. Deliberate Indifference
“[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.” Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation omitted). However, “[p]rison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.” Adames v. Perez, 331 F.3d 508, 512 (5th Cir.2003). “Deliberate indifference” means that the official “knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. “Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.” Id. at 842, 114 S.Ct. 1970.
Hampton first argues that her failure to provide Taylor with ammunition for the block gun is “simple negligence” that cannot constitute deliberate indifference. However, Hampton’s testimony at trial undercuts her argument that this failure was accidental. Hampton stated:
... It was my mistake that I didn’t check the gun. And when — the reason — I handed the gun over to Lieutenant Taylor. The reason I came off the yard, because Samuel Williams said that he wasn’t going to come off the yard until he got a money withdrawal slip from the case manager.
And by me giving Lieutenant Taylor the gun, I had the two bullets in my pocket, because I thought that I was going to run in the case manager’s office, which would take about a minute or two, and come back out.
Hampton further stated: “I handed Lieutenant Taylor the gun and the keys, and thinking that I’m going to come back out in less than a minute or two, I took the rounds with me.” Similarly, Hampton testified that she did not check the block gun for ammunition because she assumed it was loaded. A reasonable jury could infer from this language that Hampton’s actions were deliberate rather than accidental or involuntary.
Hampton next argues that no evidence was presented showing that she was actually aware of a substantial risk of serious harm to inmates. Although no direct evidence of Hampton’s mental state was presented, there was no shortage of evidence of the conditions in Unit 32. Commissioner Epps testified that Unit 32 was “a dangerous place” at the time of the incident. He further testified that Unit 32 housed “core members” of rival gangs, making violence essentially inevitable. He testified that rival gangs fought each other “all the time,” and that inmates would fashion weapons out of nearly any available materials. He explained that although Unit 32 was built with an open outdoor exercise area, individual pens had to be installed because inmates “kept fighting and stabbing each other.” He also explained that officers “always [had] to be on [their] Ps and Qs” because some inmates were able to escape from even double-locked handcuffs. Regarding the attack on Reed, Williams, and Bynum, Commissioner Epps opined that “the incident was going to happen either on the pens or somewhere else.”
*198 Ricky Scott, a Security Threat Group Coordinator for the MDOC, testified that Reed, Williams, and Bynum had been attacked pursuant to a “war” between rival gangs. Scott testified that inmates would “try[ ] to beat the security whichever way they can” in order to attack other inmates. Lawrence Haefeli, an expert witness called by the plaintiffs, explained many of the factors that gave rise to a particularly dangerous situation in Unit 32. Finally, Hampton was found guilty of a Group 3 violation, which reflected the belief of prison officials that her actions had threatened human life or safety.
From these facts, a rational jury could infer that Hampton, who had been working as a correctional officer at Parchman for approximately eight years, was aware of a high risk of inmate-on-inmate violence in Unit 32. A rational jury could also infer that Hampton was aware that leaving Lieutenant Taylor alone to guard the exercise pens without any block gun ammunition (and therefore without any effective way to resist escaped inmates) presented a substantial risk of serious harm.[4] Viewed in the light most favorable to the verdict, the evidence showed that Unit 32 housed the most dangerous inmates in the Mississippi prison system, some of whom were both highly motivated to attack other inmates and determined to thwart the prison’s security measures. In such a situation, where escape is a constant threat, backup measures for stopping escaped inmates are particularly important.
Hampton argues that there was “no evidence of a ‘longstanding and pervasive’ risk of harm at the single-person exercise pens where this attack occurred.” Such specificity is not required, however. If Unit 32 inmates are generally at risk of attack by fellow inmates, this risk would seem to be just as present in the outdoor exercise pens. Hampton identifies no reason why the threat would be reduced in the outdoor exercise pens, and the evidence presented at trial suggests, if anything, the opposite.
II. Causation
Hampton also argues that, even assuming she was deliberately indifferent to a substantial risk of serious harm, her actions did not cause Reed’s death or Williams’ and Bynum’s injuries. Hampton contends that “even if [she] had given [Lieutenant] Taylor a loaded block gun and an unlimited supply of ammunition, this attack would have still occurred as [Lieutenant] Taylor dropped the keys to the exercise pens and ran inside the prison.” Accordingly, Hampton argues that “Taylor’s failure to secure the keys to the exercise pens was the superseding cause” of the harm to the plaintiffs.
As Hampton notes, there is no direct evidence showing that Taylor ever attempted to fire the block gun or realized that the gun was unloaded. However, based on the evidence presented, the jury could have rationally inferred that but for Hampton’s failings, the attack would have *199 been thwarted. Although Taylor initially pointed his gun at the two escaped inmates and succeeded in stopping their advance, he ultimately chose to retreat for reasons that are unknown. He may have attempted to fire the gun and discovered that it was unloaded. Alternately, he may have assumed the gun was loaded but realized that he had no extra ammunition, leaving him with at most one round to stop two armed inmates. While there are of course other possible explanations for Taylor’s actions, both of the explanations above are plausible. Furthermore, assuming it was lack of ammunition that caused Taylor to flee in fear and panic, it would hardly be surprising for this same fear and panic to prevent him from picking up the dropped keys before running away. Causation is an “intensely factual” question, Moms v. Dearborne, 181 F.3d 657, 673 (5th Cir.1999) (quotation omitted), and we cannot say that the jury’s finding on this issue was irrational or entirely without eviden-tiary support.
III. Qualified Immunity
After the plaintiffs rested at trial, Hampton moved for a directed verdict, arguing that her actions constituted negligence at worst and did not rise to the level of deliberate indifference. However, Hampton made no argument relating to qualified immunity. At the close of evidence, Hampton renewed her motion for a directed verdict on the same grounds, and again did not mention qualified immunity. The jury was instructed on the defense of qualified immunity, and was told that Hampton is not liable if “her conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident in issue.” After the jury returned its verdict, Hampton moved for judgment as a matter of law, arguing that her actions “amount[ed] to no more than simple negligence,” that she was not subjectively aware of any substantial risk of serious harm, and that her actions did not cause the harm to the plaintiffs. Once again, she made no argument relating to qualified immunity. Accordingly, because Hampton did not raise the issue of qualified immunity before the district court, we review for plain error.
To demonstrate plain error, an appellant must show an error that is clear or obvious and that affected her substantial rights. Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). If the appellant makes such a showing, this court has the discretion to remedy the error, but should do so only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.
In Hampton’s appellant brief, she argues that it would not have been clear to a reasonable officer that failing to give Lieutenant Taylor ammunition for the block gun was a violation of federal law. Specifically, she contends that “[s]uch is a violation of MDOC protocol, but is not clearly ‘unlawful’ to a reasonable officer.” Hampton correctly notes that “[violations of non-federal laws cannot for a basis for liability under § 1983.” However, Hampton’s liability here is not based on a violation of MDOC protocol — it is based on a violation of the plaintiffs’ federal constitutional rights under the Eighth Amendment. In Hampton’s reply brief, she argues for the first time that her actions were “objectively reasonable” in light of clearly established law at the time. However, Hampton does not cite even a single case setting forth the relevant legal standard for failure to protect an inmate from attack by other inmates. In short, Hampton has not shown that the district court committed any clear or obvious error in *200 denying judgment as a matter of law based on qualified immunity.
CONCLUSION
For the reasons explained above, we AFFIRM the judgment of the district court.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. There were multiple buildings in Unit 32. Building B, where the incident giving rise to this case occurred, had 28 associated pens. 2. A block gun is a 37mm single-shot, break-open gun that shoots a large rubber slug. It is the only type of firearm carried by guards inside the prison.

. Nash and Hayes both had shanks, i.e., knife-like weapons made from any available materi-áis.

. The dissent notes the absence of any evidence showing that Hampton knew the block gun was unloaded and suggests that she was merely negligent in handing over the block gun without verifying that it was loaded. However, the evidence suggests that she consciously disregarded the risk that the gun might not be loaded, which is better characterized as recklessness. In any event, even if Hampton was merely negligent in failing to check the block gun for ammunition, her testimony clearly shows that her failure to give Taylor the extra rounds was deliberate. Therefore, even in the best case Hampton knew that she was leaving Taylor with at most one block gun round to guard numerous inmates. This scenario would also support the jury's determination that Hampton was deliberately indifferent to a substantial risk of serious harm.

. Ante at 198 (emphasis added).