# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2015

Lyle W. Cayce
Clerk

No. 12-60933

SAMUEL T. WILLIAMS, Individually; KOURTNEY BYNUM, Individually; DONALD REED, SR., Individually and on Behalf of the Wrongful Death Beneficiaries of Donald Reed, Jr.; JUDY THOMPSON, Individually and on Behalf of the Wrongful Death Beneficiaries of Donald Reed, Jr.,

Plaintiffs–Appellees,

v.

SHARON HAMPTON,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, and COSTA, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge, joined by STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, CLEMENT and PRADO, Circuit Judges:

While confined at a Mississippi penitentiary, Donald Reed, Jr. was brutally attacked and murdered by other prisoners. Two other inmates, Samuel Williams and Kourtney Bynum, were also attacked but recovered from their injuries. Reed's survivors, Williams, and Bynum (collectively the

No. 12-60933

plaintiffs) sued Sharon Hampton, a corrections officer, under 42 U.S.C. § 1983 asserting that she had violated the Eighth Amendment's prohibition against cruel and unusual punishments.  A jury found that Hampton was deliberately indifferent to the safety of the victims of the attacks.  A divided panel of this court affirmed the district court's denial of Hampton's motion for judgment as a matter of law.[1]   After rehearing the case en banc, we now reverse the judgment of the district court because Hampton's acts or omissions did not, as a matter of law, rise to the level of deliberate indifference.

## I

Because we examine the evidence in some detail below in considering the legal sufficiency of the evidence to support the verdict, we only briefly recount the operative facts here.  The inmate-on-inmate attacks occurred on an outdoor exercise yard in Unit 32 of the State Penitentiary in Parchman, Mississippi. Each prisoner was confined in a single-person pen during his one-hour exercise period each day.  Sharon Hampton had been guarding the exercise area and had been in possession of a block gun, which holds only one hard rubber slug, approximately five to six minutes before the events leading to the attacks began.  It was past time for the prisoners on the yard to be taken back inside. One of the plaintiffs in this case, Samuel Williams, who testified at trial, told Hampton that he would not come out of his pen unless she went inside and obtained a money withdrawal slip for him.  A supervisor, Anthony Taylor, relieved Hampton, and she handed the block gun and the keys to the individual exercise pens to Taylor before she went inside to obtain the withdrawal slip. Hampton had two rubber pellets for the block gun in her pocket and did not give them to Taylor when she left the yard area.

---

[1] *Williams v. Hampton*, 562 F. App'x 192 (5th Cir. 2014) (per curiam) (vacated by the grant of rehearing en banc).

2

No. 12-60933

While Taylor was on guard, two inmates escaped from their respective exercise pens, and they ran toward Taylor. He pointed the block gun at them, the escaped inmates stopped momentarily, then Taylor turned and ran inside the prison without firing the block gun. Taylor dropped the keys to the individual exercise pens on the ground as he fled. One of the inmates who had escaped used the keys to release five other prisoners from their pens. The seven escaped inmates carried out the attacks on Reed, Bynum and Williams while Hampton was inside the prison. It was later determined that the block gun was unloaded and had been unloaded most, if not all, of the day.

The plaintiffs contend that Hampton was deliberately indifferent to the safety of the inmates who were attacked by failing to ascertain whether the block gun was loaded when she began her shift on the prison yard and by failing to give Taylor the two pellets for the block gun that were in her pocket when she entered the prison.

At the close of the evidence, the district court denied Hampton's Rule 50(a) motion for judgment as a matter of law.[2] The jury found that Hampton was deliberately indifferent to the safety of Reed, Bynum and Williams; and that Hampton was not entitled to the defense of qualified immunity. The jury awarded $25,000 to Williams, $25,000 to Bynum, and $100,000 to the survivors of Reed. Hampton has appealed, contending that her failures regarding the block gun fall short of deliberate indifference as a matter of law, her acts and omissions were not the cause of the death and injuries because the attackers would not have had access to the three inmates in their individual 180-square-foot exercise pens but for Taylor's dropping the keys, and that the jury's verdict that Hampton was not entitled to qualified immunity cannot stand because it

---

[2] FED. R. CIV. P. 50(a).

3

No. 12-60933

would not be clear to a reasonable officer that an act of negligence which violated prison protocols is "unlawful" and violates federal law.

Because we conclude that there is legally insufficient evidence to support the jury's finding that Hampton was deliberately indifferent, we do not consider the two other issues that she has raised. We reverse the district court's judgment against Hampton.

## II

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."[3] This duty is derived from the prohibition of "cruel and unusual punishments"[4] in the Eighth Amendment.[5] The Supreme Court has explained that "[i]t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."[6] The Court has made clear "that a prison official violates the Eighth Amendment only when two requirements are met."[7] One is that "the deprivation alleged must be, objectively, 'sufficiently serious.'"[8] "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."[9] "The second requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'"[10] "To violate the Cruel and Unusual Punishments

---

[3] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (omission in original).

[4] U.S. CONST. amend. VIII.

[5] *Farmer*, 511 U.S. at 832.

[6] *Id.* at 834.

[7] *Id.*

[8] *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

[9] *Id.*

[10] *Id.* (quoting *Wilson*, 501 U.S. at 297)).

Clause, a prison official must have a 'sufficiently culpable state of mind.'"[11] The Supreme Court has explained that "[i]n prison-conditions cases, that state of mind is one of 'deliberate indifference' to inmate health or safety."[12]

The Supreme Court's seminal decision as to what constitutes "deliberate indifference" is *Farmer v. Brennan*.[13] Since at least 1976, the Court's decisions had reflected that "deliberate indifference describes a state of mind more blameworthy than negligence,"[14] and "Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"[15] The Court's decisions were "also clear that [deliberate indifference] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."[16] The Supreme Court noted in *Farmer* that Courts of Appeals had "routinely equated deliberate indifference with recklessness,"[17] but that did not "fully answer the . . . question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining."[18] The Court explained that the civil law generally employs an objective standard in determining recklessness. "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so

---

[11] *Id.* (quoting *Wilson*, 501 U.S. at 297)). *But see id.* at 835 (observing that "'application of the deliberate indifference standard is inappropriate' in one class of prison cases: when 'officials stand accused of using excessive physical force'" and that in such cases a claimant must show that officials applied force maliciously and sadistically for the very purpose of causing harm) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).

[12] *Id.* at 834 (quoting *Wilson*, 501 U.S. at 302-303)).

[13] 511 U.S. 825 (1994).

[14] *Id.* at 835 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

[15] *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

[16] *Id.*

[17] *Id.* at 836.

[18] *Id.*

obvious that it should be known."[19]  By contrast, the criminal law employs a subjective standard.  It "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware."[20]

The Supreme Court refused to adopt an objective test for deliberate indifference.[21]  The Court held that "Eighth Amendment suits against prison officials must satisfy a 'subjective' requirement."[22]  The Court explained "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."[23]  There are two necessary components:  (1) "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) "he must also draw the inference."[24]  Subjective recklessness as used in the criminal law is the test for deliberate indifference under the Eighth Amendment.[25]

The Supreme Court has reasoned that this subjective test flows from the punishment aspect of the Eighth Amendment.  "[I]n the Eighth Amendment context . . . a subjective approach isolates those who inflict punishment."[26]  "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it

---

[19] *Id.*

[20] *Id.* at 837.

[21] *Id.*

[22] *Id.* at 838 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

[23] *Id.* at 837.

[24] *Id.*; *see also Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) (quoting *Farmer*, 511 U.S. at 837).

[25] *Farmer*, 511 U.S. at 839-40.

[26] *Id.* at 839.

outlaws cruel and unusual 'punishments.'"[27]  Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."[28]

We apply the principles articulated in *Farmer* as we consider whether there is legally sufficient evidence to support the jury's finding in the present case that Hampton was deliberately indifferent.

## III

We are reviewing the district court's denial of a motion for judgment as a matter of law under Rule 50(a).[29]  "[A] court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"[30]  The Supreme Court has explained that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"[31]  We "should review all of the evidence in the record," but "[i]n doing so . . . [we] must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence."[32]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[33]

---

[27] *Id*. at 837.

[28] *Id*. at 838.

[29] FED. R. CIV. P. 50(a).

[30] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting FED. R. CIV. P. 50(a)).

[31] *Id*. at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

[32] *Id*.

[33] *Id*. (quoting *Liberty Lobby*, 477 U.S. at 255).

No. 12-60933

"[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."[34] This means "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"[35]

The plaintiffs contend that Hampton was deliberately indifferent to a substantial risk of inmate-on-inmate violence when she failed to ascertain if the block gun was loaded and because she took two rubber pellets with her back into the prison building and did not give them to Taylor when he relieved her in the exercise yard while she went inside. The block gun at issue was a 37-millemeter weapon. It was about 36 inches (a yard) long, and it held one round of ammunition. It would fire only once and would then have to be reloaded. It had a lever and operated much like a double-barreled shotgun with respect to how it opened to be loaded and unloaded but not with respect to having two chambers. After firing, the person operating it would have to open the gun, pull out the casing of the projectile that had been fired, and insert another round to shoot again. The projectiles were rubber bullets. The plaintiffs' expert witness testified that the block gun was a nonlethal weapon. The plaintiffs also called as a witness one of the inmates who participated in the attacks, Edward House, and he testified that he had been shot with a block gun before the day in question, and "[i]t hurts momentarily" but that "it will surpass [sic]."

Christopher Epps, the Commissioner of the Mississippi Department of Corrections (MDOC), testified that the officer who was first on duty in the

---

[34] *Id.* at 151.

[35] *Id.*

exercise yard that day should have checked the block gun to assure that it was loaded before taking the weapon onto the exercise yard. No one disputes this. Epps also testified, without contradiction, that corrections officers are not supposed to open the block gun when inmates are being transported to or from the exercise pens. If the gun were opened and a projectile "popped out," the officer might be vulnerable from attack by an inmate. Officers are to remain a certain number of feet from the inmates with this weapon. An expert witness for the plaintiffs testified that he thought that an officer with a block gun would have time to inspect the weapon to see if it was loaded after the inmates were confined in their exercise pens.

The evidence is undisputed that there were three rounds of ammunition for this block gun. Hampton testified directly to this fact, and no one, including the experts called by the plaintiffs, took issue with this testimony. All the testimony regarding the block gun throughout the trial indicated that the two rubber pellets Hampton took inside with her were extra ammunition for the block gun, not the only two pellets for the weapon.

There is no evidence that the officer who obtained the block gun before going onto the yard at the beginning of the day was Hampton. Hampton testified that when she came to work that morning, she was assigned to the exercise yard, and when she arrived at the yard, Taylor was already there with the block gun and the ammunition. Hampton testified that when she first went onto the exercise yard, inmates had already been brought onto the yard, and the process of bringing them to and from the exercise pens was ongoing. Hampton relieved Taylor when she arrived on the yard. Though the plaintiffs attempt to dispute this in their briefing by arguing that Hampton was impeached on this point, the record does not support the plaintiffs' assertion. The evidence reflects that Taylor was on the exercise yard that morning before Hampton. Taylor did not testify at trial, but the record contains statements

he made to investigators after the assaults and his written statement, though his written statement is unsigned. The investigative report reflects that Taylor told investigators the following: he (Taylor) was on the exercise yard, watching the pens, when he was told by the Commander to place Hampton in the exercise yard to guard the inmates. Taylor instructed Hampton to report to the yard, and he gave her the block gun. Consistent with this report, Taylor's written statement says that he had been on the exercise yard for about an hour when the Commander told him to have Hampton stay in the exercise yard while Taylor assisted with escorting inmates from the building. Taylor's written statement says that "Hampton was on the yard most of the day." The investigative report similarly reflects that Taylor said that Hampton was stationed on the exercise yard for several hours guarding the inmates after she relieved him, and Taylor resumed his duties of searching and escorting inmates to the yard.

The record reflects that Hampton relieved Taylor twice that day, once in the morning, and later in the afternoon. Taylor relieved Hampton after she had relieved him for the first time early in the morning, and Taylor relieved Hampton in the afternoon before relieving her again for the five-minute period just before the attacks began. There is no evidence that anyone other than Taylor or Hampton was in possession of the block gun while on the exercise yard the day of the attacks.

Two witnesses called by the plaintiffs testified that Taylor was on the exercise yard before Hampton the afternoon of the attack. Smothers, one of the attackers, testified on direct examination that when he first went out to the exercise yard, Taylor was there, and Taylor then changed out with Hampton. Smothers did not know that Taylor later came back and that Hampton had left the yard at the time of the attacks. When asked to clarify, Smothers repeated that when he first went out onto the yard, "Taylor was there

first" and he saw Hampton "come out there next." Another of the attackers, House, called as a witness by the plaintiffs, testified on direct examination that when he came onto the yard, Taylor was there "walking back and forth with the block gun." Hampton came on the yard later but "he [Taylor] sooner or later got her to go back in while he held down the yard."

These accounts are consistent with all the evidence of how the attacks unfolded, which was that about five minutes before two inmates escaped from their pens, Hampton asked Taylor to relieve her for "awhile" in order for her to retrieve paperwork at Williams's request, and Hampton told Taylor "that she was coming 'right back'." Hampton gave Taylor the keys and the block gun but did not relinquish to him any ammunition for the gun, and Taylor did not ask for any ammunition. Taylor admitted that he did not check the weapon to insure that it was loaded when Hampton went inside the prison. Taylor had been on the yard for approximately five minutes when he saw two inmates (Lester Nash and Derrick Hayes) running toward him. Taylor's written statement to investigators after the attacks is consistent with this account in the report, though Taylor refused to sign his written statement because he requested removal of his admissions that he had sat in a chair when assigned to the exercise yard and had not asked for ammunition to the block gun when Hampton handed it to him.

The exercise yards at Unit 32 were originally open areas, but fighting and stabbings had occurred. As a result, Mississippi built single-person exercise pens. At the time of the assaults in this case, there were twenty-eight, 180-square-foot, single-occupancy exercise pens on the exercise yard for Building B that were constructed of cyclone metal fencing on all sides and across the top, so that the areas were completely enclosed. An inmate who stood in the middle of his locked pen could avoid attack from other prisoners outside the pen.

11

One of the inmates involved in the assaults on Reed, Bynum and Williams testified that it was not difficult to get out of the exercise pens. However, there is no evidence that Hampton knew or thought that it was not difficult to escape from the exercise pens, and there was no evidence that any escapes had occurred from the exercise pens prior to the day of the attacks at issue.

The Commissioner of the MDOC testified that inmates "will take . . . that wire and unwhittle it out of the fence and sharpen it on the concrete and make a shank." There was also evidence at trial that inmates who were classified as "camp support" were not subjected to strip searches and had access to the exercise pens. "Camp support" inmates would sometimes place homemade weapons in the exercise pens after the pens had been inspected for use of the inmates who were to be confined in them. One of the inmates who participated in the attacks against Reed, Bynum and Williams testified at trial that on the day of the attacks, he had been strip-searched, but a "camp support" inmate left a shank for him in the exercise pen. The Commissioner additionally told the jury that because of the violent nature of rival gang members housed in the prison, "at the end of the day, the incident was going to happen either on the pens or somewhere else." However, until the attacks on Reed, Bynum and Williams, there is no evidence that there had actually been inmate-on-inmate assaults in the exercise area after the single-person pens were constructed.

In her statements to authorities after the assaults and her trial testimony, Hampton said that she knew that she had two rounds of ammunition in her pocket when she went into the prison and did not give them to Taylor because she thought that she would only be gone a minute or two. It is undisputed that Hampton told Taylor that she would be "right back." She testified that "the gun that Anthony Taylor had while he was out there on yard call should have already been loaded," and "that's when I assumed that the

gun was already loaded when I went out there." This assumption was based on the uncontradicted evidence that there were three rounds of ammunition for the block gun. Hampton repeated later in her testimony that Taylor, a supervisor, had only given her two rounds when she had relieved him earlier in the day, and there were three rounds of ammunition for the block gun. She also said, "according to me, Lieutenant Taylor should have already had the gun loaded before he put the first inmate out there." Hampton acknowledged from the outset of the investigation after the assaults and at trial that she had not insured that the block gun was loaded, and Hampton testified at trial that she had made a mistake in failing to check the block gun.

It was determined after the assaults that the block gun was not loaded. The plaintiffs contend, and the evidence is uncontradicted, that Hampton was on the exercise yard for an extended period of time, most of the day, with an unloaded block gun. Just before the assaults began, she gave the unloaded block gun to Taylor. The two extra rounds of rubber pellets for the block gun were in Hampton's pocket when she went into the prison; they were not in Taylor's possession.

After Hampton went inside the prison, Nash and Hayes escaped from their respective exercise pens. Each pen had a piece of angle iron that was spot welded in three places to the bottom edge of the pen's door. Nash used a hack saw to loosen the door to his pen and then kicked out the bottom of the door to his pen. Nash had handed the hack saw to Hayes in this process, and Hayes escaped when Nash pulled him from under the partially compromised door to Hayes' pen. Nash and Hayes then ran toward Taylor. They told Taylor that they were going to kill him. Nash and Hayes each had a homemade shank or knife. Taylor raised the block gun and pointed it at them. Nash and Hayes stopped. The evidence is not entirely consistent as to exactly what transpired next, but viewing the evidence in the light most favorable to the jury's finding,

No. 12-60933

Taylor told investigators that he did not know how many inmates had escaped, he saw that Nash and Hayes had shanks, and he decided to run inside the building.  He also told investigators that he "panicked" and somehow dropped the keys.  Taylor said in his written statement, "I admit that I panicked and somehow dropped the keys to the Exercise Pens."  One of the attackers testified at trial that when Nash and Hayes confronted Taylor, "Taylor, he kind of panicked and ran into the building."  (There was some evidence that Taylor was also a gang member and was part of a plan to carry out the assaults, but we do not consider that evidence; nor do the plaintiffs rely upon it.)  An inmate interviewed after the attacks said that he heard Taylor shout "[d]on't kill me."

The evidence in the record is uniform that Taylor did not attempt to fire the block gun at Nash or Hayes before running inside the building.  Williams, one of the plaintiffs, told investigators after the incident that Taylor "did not fire the weapon because he was scared."  In the plaintiffs' briefs in our court, they contend that Taylor "realiz[ed] too late the block gun was unloaded." However the citation to the record in the brief does not support this statement, even arguably.  There is no evidence in the record that Taylor knew the block gun was unloaded when Nash and Hayes charged towards him nor any evidence from which it could be inferred that Taylor realized the block gun was unloaded.

It is, however, undisputed that as Taylor ran toward the building and the keys to the pen had fallen to the ground, Reed, who was killed in the attacks, and Samuel Williams, one of the plaintiffs, both beseeched Taylor to pick up the keys.  Courtney Bynum, another of the plaintiffs, testified that Reed and Williams shouted "please don't leave them keys out here, pick them keys up."  But Taylor disregarded these pleas and fled into the prison.  Taylor also left his baton (night stick) on the exercise yard when he retreated.

14

No. 12-60933

Nash and Hayes followed Taylor inside the building, into the administrative hallway. Another officer, who was inside an office in the building, opened a door for Taylor, and Taylor went safely into the tower. Hayes beat on the Captain's office door, but another officer held it shut and ordered Hayes to get away. Hayes and Nash returned to the yard, and Nash ordered Hayes to hold the door shut. Hayes or another inmate, or both, leaned on the door into the prison to keep officials from coming onto the yard through it. By most accounts, Nash picked up the keys to the pens that Taylor had dropped on the ground, and Nash used the keys to unlock the pens of five other inmates, though Williams, who is one of the plaintiffs, said that Hayes picked up the keys and unlocked the pens of other inmates. There is no dispute that seven inmates were involved in the attacks. Six of the seven inmates were armed with shanks, one was also armed with Taylor's baton, and another testified that he wielded the angle iron from Hayes's pen as a weapon and used it to hit Reed, Bynum and Williams. The angle iron was so heavy, the inmate had to use both hands to carry and swing it. This group of inmates then proceeded to unlock the pens in which Reed, Bynum and Williams were confined and to attack them. Reed was attacked first and did not survive the multiple stab wounds and blows that were inflicted, including blows to his head with the angle iron. Bynum and Williams were stabbed and beaten but recovered from their injuries.

At the conclusion of an investigation, Hampton was found by a prison review process to have committed acts that threatened the health and safety of others in failing to check the block gun to determine if it was loaded and for taking ammunition for the block gun inside the prison. Her failure to determine if the block gun was loaded and her failure to give Taylor the two slugs she had in her pocket violated MDOC protocol. She received a ten-day suspension without pay for this violation.

15

No. 12-60933

**IV**

It is undisputed that the block gun was unloaded when Hampton gave it to Taylor, minutes before the assaults on Reed, Bynum and Williams were set in motion.  However, there is no evidence that Hampton knew the block gun was unloaded.  Nor is there evidence from which a reasonable factfinder could draw the inference that Hampton knew the block gun was unloaded.  The plaintiffs argue only that Hampton had the opportunity to check the weapon while she was in possession of an unloaded block gun on the exercise yard for many hours, she did not do so, and she admitted to making a mistake in failing to check the block gun.  But these facts do not support an inference that Hampton realized the block gun was unloaded before she gave it to Taylor the afternoon of the attacks.  In light of the fact that Hampton was on the exercise yard most of the day with an unloaded block gun, it would be somewhat irrational to conclude that Hampton realized she should check the block gun but consciously chose not to do so.  Hampton's failure to determine whether the block gun was loaded would no doubt support a finding of negligence, but as the Supreme Court has explained, "deliberate indifference describes a state of mind more blameworthy than negligence."[36]

Hampton did know that she failed to give the two rubber pellets in her pocket to Taylor when she went inside the prison for what she thought would be a few minutes.  She knew that she had taken the pellets with her.  It is also fair to infer from the record that Hampton knew there was a substantial risk, as a general proposition, that inmates in Unit 32 would attack other inmates if the opportunity arose.  But a risk that inmate-on-inmate violence has occurred and may occur again does not describe the risk in this case at the appropriate level of specificity in light of the facts of this case.

---

[36] *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

16

The Supreme Court held in *Farmer* that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."[37] The Supreme Court elaborated, holding "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[38] At another juncture in the *Farmer* decision, the Supreme Court held that "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'"[39] What was the risk to an inmate from attack by another inmate when Hampton left Taylor with what she believed to be a loaded block gun and took two rubber pellets into the prison for what she thought would be a few minutes? There was a risk to Taylor, but that would not have implicated the Eighth Amendment. There was a risk that if a lone inmate escaped and threatened harm to another inmate, a single shot from the block gun would be inadequate to deter the attacker, Taylor would be unable to reload a second or third round to attempt to deter the attacker, and the attacker could inflict harm on another inmate who, for some reason, was outside of his locked pen. There was a risk that if more than one inmate escaped from the pens and threatened to attack another inmate or inmates who were, for some reason, also outside the locked pens, Taylor would remain on the exercise yard rather than seek help, would fire the single round in the block gun and would then be unable to reload a second or third round in an

---

[37] *Id.* at 837.

[38] *Id.*

[39] *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

attempt to prevent a second or multiple attackers from proceeding to attempt to harm another inmate or inmates.

Whether Hampton was actually aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and whether she actually drew the inference are questions of fact.[40]  There is no direct evidence that Hampton actually knew that there was an excessive risk to inmate safety or that she disregarded such a risk.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[41]  The Supreme Court explained, however, "[i]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of."[42]  The Supreme Court said, "[f]or example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'"[43]

---

[40] *Id.* at 837, 842; *see also Longoria v. Texas*, 473 F.3d 586, 595 (5th Cir. 2006) ("Whether a prison official had knowledge of a substantial risk to inmate safety is a question of fact . . . .").

[41] *Farmer*, 511 U.S. at 842 (citation omitted).

[42] *Id.* (second alteration in original) (citations omitted).

[43] *Id.* at 842-43; *see also Longoria*, 473 F.3d at 595 (observing that "[i]f [two prison officials] had indeed received repeated warnings from [the inmate who was attacked by

No. 12-60933

There is no evidence that any inmate had escaped from the exercise pens prior to the day of the attacks at issue, much less evidence that more than one inmate escaped at the same time. Although the Commissioner of the MDOC may have been of the opinion that the inmate attacks on Reed, Bynum and Williams were "going to happen either on the pens or somewhere else," there is no evidence Hampton knew of his opinion or shared that view before the attacks occurred. There is no evidence that corrections officers were trained to stand their ground or had in fact done so with a block gun and two extra pellets in hand when two inmates armed with shanks were threatening to kill the officer. There is no evidence that in the past, corrections officers had dropped the keys to the exercise pens or that the keys had otherwise become available to an escaped inmate. There is no evidence that a block gun could have been reloaded once or twice after initial firing in time to neutralize more than one inmate threatening harm to a corrections officer or other inmates.

The amount of time that Hampton had within which to appreciate the risk of harm and to draw an inference regarding the nature of that risk is also a factor in our analysis. In many prison confinement cases, the officials who have been sued had time to consider and reflect upon the various options. For example, in *Farmer*, a 19- or 20-year-old male transsexual inmate had, prior to his imprisonment, undergone estrogen therapy, received silicone breast implants and had submitted to unsuccessful "black market" testicle-removal

---

another inmate], including the currently unauthenticated letter in which [the attacked inmate] details the . . . plot to kill him and his fear of remaining in lockdown with his putative murderers, [the prison officials] might have been aware of facts from which inferences suggesting deliberate indifference could be drawn"); *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) (recognizing that "the plaintiff can produce circumstantial evidence that the risk to inmate health or safety was so longstanding and pervasive that the official must have been aware of this danger").

19

surgery.[44]  He claimed to have continued hormonal treatment while in prison and wore clothing in a "feminine manner, as by displaying a shirt 'off one shoulder.'"[45]  Federal prison authorities transferred him, for disciplinary reasons, from a correctional institution to a penitentiary, which would "typically [be a] higher security facilit[y] that house[d] more troublesome prisoners."[46]  After this inmate was placed in the general population, he was raped and beaten.[47]  He sued, alleging that officials knew that the penitentiary had a violent environment and a history of inmate assaults, and that they knew that the plaintiff would be particularly vulnerable to sexual attack as a transsexual who exhibited feminine characteristics.[48]  There was also an indication that one prison official had told the inmate that, because of his sexual orientation and appearance, he was "likely to experience a great deal of sexual pressure" in prison, and another official had told him that there was "a high probability that [petitioner] could not safely function" at the prison to which he was transferred.[49]  There was, relatively speaking, considerable time for the prison officials in *Farmer* to contemplate what risks might exist and whether to subject the inmate to those risks.  In the *Farmer* decision, the Court gave other examples of situations in which prison officials might be found to have been deliberately indifferent to a sufficiently substantial risk of serious damage to an inmate's future health or safety.[50]  In each of those examples there would have been time for the official to consider the risk and whether to

---

[44] *Farmer*, 511 U.S. at 829.

[45] *Id.*

[46] *Id.* at 830.

[47] *Id.*

[48] *Id.* at 831.

[49] *Id.* at 848-49 (alteration in original).

[50] *Id.* at 843-44 & n.8.

No. 12-60933

act or fail to act in the face of that risk. By contrast, Hampton had a short span of time to reflect upon the risk presented in taking the two rubber pellets with her inside the prison for what she believed would be an absence from the exercise yard of a few, or perhaps several, minutes.

Based on the record before us, there is legally insufficient evidence to satisfy the subjective element of deliberate indifference, which has its genesis in the cruel and unusual punishments clause of the Eighth Amendment. Hampton's acts or omissions did not amount to punishment of Reed, Bynum or Williams, as that concept has been defined by the Supreme Court.

## V

The plaintiffs marshal considerable evidence that Unit 32 had a history of violence and inmate-on-inmate attacks. They contend that a corrections officer, such as Hampton, must have known of these conditions, and that it is reasonable to infer that she acted with deliberate indifference to the safety of inmates such as Reed, Bynum and Williams because of this history.

The Commissioner of the MDOC testified that Unit 32 was a dangerous place at the time of the attacks on the three inmates. He recounted that rival gangs fought each other "all the time" and that they made shanks out of various objects, such as lights similar to those that were in the trial courtroom. Inside the cell blocks, the inmates used their bed sheets to move shanks and other contraband from cell to cell. He testified that "we always have rival fights and stabbings, and unfortunately, sometimes killings with the gangs." Core members of rival gangs were housed within Unit 32.

Commissioner Epps opined that Unit 32 was unsuitable for the purposes for which the MDOC used it. "It was never built for a closed maximum security unit, and that's what we was [sic] using it for." Unit 32 housed approximately 1,000 inmates. The attacks occurred on the exercise yard of Building B. Building B was one of five buildings in Unit 32.

21

No. 12-60933

Another MDOC official, Ricky Scott, testified regarding gang violence at Unit 32, saying that some of the gang members were "at war" with one another. Gang members had evaded security measures and attacked other gang members, and gang members were "fighting with each other constantly."

An expert witness testified on behalf of the plaintiffs that Unit 32 was a maximum security unit that housed gang members; administrative segregation or disciplinary inmates who were either too violent to be in the general population or had committed serious rule violations; mentally ill inmates; inmates in protective custody; and death row inmates. This expert said that a report done by another expert reflected that Unit 32 housed approximately 1,000 inmates, but that 80% of them did not require confinement in a maximum security facility. The same report had concluded that the MDOC had no reclassification process that would permit inmates at Unit 32 to demonstrate improvement so that they could be sent to another place of confinement. As a result, this report concluded, there was no incentive for behavior improvement because inmates saw no way to work their way out of Unit 32, and they therefore became desperate.

Epps, as well as the plaintiffs' expert, also testified that a week before Reed, Bynum and Williams were attacked, a correctional officer trainee had smuggled a .380 semiautomatic pistol and two magazines of ammunition into the prison. However, there is no evidence that Hampton knew of this incident or that it occurred on an exercise yard. Nor was there evidence that anyone was injured as a result of this smuggling incident.

If we were to accept the plaintiffs' argument that the foregoing evidence of a history of violence and the conditions within Unit 32, generally, permits a factfinder to draw the conclusion that when Hampton failed to give the two extra pellets to Taylor as she left the exercise yard, she appreciated that there was an excessive risk of harm to inmates and knowingly disregarded that risk,

22

then liability for acts or omissions that would otherwise constitute negligence can be imposed whenever a corrections officer at Hampton's level knows that she is working in a prison with a similar history. That is analogous to a form of strict liability for corrections officers such as Hampton, and the Eighth Amendment does not support such a theory of culpability. Imposing liability because an officer such as Hampton is aware that inmates have attacked other inmates in the past would demand near-perfect foresight from prison guards.

Hampton had no means of controlling how Unit 32 was used, the classification of inmates housed there, or the general policies and procedures implemented at Unit 32. Those matters were within the hands of official beyond her pay grade. Hampton's job at Unit 32 was to arrive at the prison at approximately 7:45 in the morning in uniform. She stood for muster and inspection to see that she was properly groomed, her uniform was properly buttoned, her shoes were shined, etc. The watch commander would then tell her whether she would be working in Building A, B, C, D, E or F or whether she would be assigned to the sally port, the yard tower, the kitchen, or some other area of the prison. To say that Hampton was deliberately indifferent to risks to inmates under the circumstances of the present case because of her knowledge that the environment in which she worked was dangerous to her and to inmates erects a standard for culpability for her and others like her that is beyond what our court and the Supreme Court have said is warranted.[51]

---

[51] *See Doe v. Robertson*, 751 F.3d 383, 391 n.10 (5th Cir. 2014); *Longoria v. Texas*, 473 F.3d 586, 593 n.9 (5th Cir. 2006); *Adames v. Perez*, 331 F.3d 508, 512-14 (5th Cir. 2003) (applying a plain error standard of review and holding no evidence supported the jury's finding); *see also Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004); *Verdecia v. Adams*, 327 F.3d 1171, 1176-77 (10th Cir. 2003); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002); *Hott v. Hennepin Cnty.*, 260 F.3d 901, 907-08 (8th Cir. 2001); *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998); *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997); *Woods v. Lecureux*, 110 F.3d 1215, 1224-25 (6th Cir. 1997); *Giroux v. Somerset Cnty.*, 178 F.3d 28, 32-33 (1st Cir. 1999); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620-21 (2d Cir. 1996).

No. 12-60933

## VI

The plaintiffs rely on the fact that Hampton was disciplined as a result of her acts and omissions on the day that the assaults on Reed, Bynum and Williams occurred. However, in their supplemental en banc briefing, the plaintiffs quote a decision of this court, acknowledging that Hampton's violation of MDOC policy "is insufficient by itself to support an argument for deliberate indifference."[52] The determinations in Hampton's disciplinary proceedings are not evidence that she knew the block gun was unloaded or that she consciously weighed the risk of failing to ascertain if the block gun was unloaded and decided not to open it. Nor are the disciplinary determinations evidence that she appreciated the risk of failing to give the two rubber pellets to Taylor or that she consciously decided to disregard those risks.

## VII

An expert witness reviewed Hampton's conduct and expressed his opinion that she acted with deliberate indifference. In a case involving a supervisor's liability for failure to train jail personnel properly in providing medical care to inmates, our court held that an expert's opinion, standing alone, is generally not evidence of deliberate indifference.[53] In that case, a

---

[52] *Longoria*, 473 F.3d at 593 n.9; *see also Robertson*, 751 F.3d at 391 n.10 (holding that a knowing violation of a policy which a correctional officer knew was designed to prevent inmate assaults cannot support a finding of deliberate indifference when the only evidence supporting the finding was the policy violation itself).

[53] *See Thompson v. Upshur County*, 245 F.3d 447, 455, 459 (5th Cir. 2001) ("Standing alone, an expert's opinion is generally not enough to establish deliberate indifference."); *see also Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) explaining:

[W]e have emphasized that, when seeking to prove a municipality's malevolent motive, plaintiffs must introduce more evidence than merely the opinion of an expert witness. In *Stokes v. Bullins*, 844 F.2d 269 (5th Cir.1988), the district court relied primarily on the testimony of a single expert witness in holding that the municipality violated § 1983. We disagreed, remarking that "an expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the

detainee died while in custody as a result of delirium tremens after experiencing symptoms over a period of time.[54]  Our court has not directly considered whether expert testimony can raise a fact issue in a case of inmate-on-inmate violence when there is no direct or circumstantial evidence that the prison guard alleged to have been deliberately indifferent to a risk of harm to the injured inmate or was subjectively aware of the risk.

However, the Eleventh Circuit concluded in a case involving an Eighth Amendment claim for failure to provide medical treatment that when the facts and circumstances presented by a plaintiff do not permit an inference that the defendant actually perceived the risk, expert opinion based on those same facts and circumstances cannot provide the "missing *Farmer* link" of subjective awareness.[55]  The Eleventh Circuit reasoned that when there is no direct or circumstantial evidence from which a jury could infer actual knowledge, "allowing expert testimony that [the defendant] should or would have known to raise a jury issue as to whether he actually knew effectively would nullify *Farmer*'s requirement of subjective mental intent."[56]  That court explained, "[t]he deficiency of the expert testimony here arises not necessarily from the specific wording of the experts' testimony—although some of Plaintiff's affidavits are lacking in many respects—but from the inherent opinion nature of expert testimony about what a person should or would have known."[57]  After commenting that "expert opinion testimony is not essential to [the] task" of establishing subjective mental intent, the court discussed other cases in which

---

inference that the town's motives were contrary to constitutional standards."
*Id*. at 275.

[54] *Thompson*, 142 F.3d at 452-54.

[55] *Campbell v. Sikes*, 169 F.3d 1353, 1368 (11th Cir. 1999).

[56] *Id*. at 1370-71.

[57] *Id*. at 1371 (footnote omitted).

No. 12-60933

it had held there were triable issues of fact as to a defendant's knowledge without expert testimony because the evidences of the particular facts and circumstances could support a jury's finding of subjective knowledge.[58]

We agree with the Eleventh Circuit's analysis. As in *Campbell v. Sikes*, since the facts and circumstances of this case do not allow an inference that Hampton actually perceived the risk, the opinion testimony by the plaintiffs' expert that she did perceive or must have perceived the risk based on those same facts and circumstances does not "provide the missing *Farmer* link."[59] The record is devoid of facts to support the expert's opinion regarding subjective awareness.

## VIII

The plaintiffs contend that our court's decision in *Cantu v. Jones*[60] is indistinguishable and that the jury in the present case was free to make credibility determinations, just as the jury in *Cantu* was permitted to do. We, of course, agree that a jury may make credibility determinations and draw reasonable inferences from the evidence, but there must be some evidence from which a reasonable inference in support of a factual finding can be drawn. For the reasons discussed above, there was no evidence in the present case from which a reasonable factfinder could conclude that Hampton was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that Hampton actually drew that inference.

In *Cantu v. Jones*, the plaintiff, Cantu, contended at trial that the three defendants had conspired to facilitate an inmate's attack on Cantu as

---

[58] *Id*. at 1372.

[59] *Id*. at 1368.

[60] 293 F.3d 839 (5th Cir. 2002).

26

retribution for serious complaints he had made about the prison's operation.[61] The defendants claimed that the evidence established "nothing more than a colossal coincidence,"[62] but our court concluded that there was "more than a scintilla of evidence" to support the jury's finding "that the appellants essentially orchestrated the attack."[63] The evidence in that case was that Cantu had been placed in administrative segregation because of his past gang membership and had sent twelve letters, three of which went to Beaird, the captain in charge of administrative segregation, expressing fear that correction officers had threatened to have Cantu assaulted by other inmates who were members of the Mexican Mafia and that Cantu feared for his life. Cantu alleged that after seeing these letters, Beaird conspired with two corrections officers to allow an inmate to escape so that Cantu would be attacked.[64] After Cantu was in fact assaulted by an inmate who was a member of the Mexican Mafia, Cantu met with Beaird who told Cantu, "[y]ou know what? I don't like a snitch. Consider yourself lucky that you are still alive."[65]

There was more than a scintilla of evidence that the escape by the inmate who attacked Cantu was not the result of negligence or oversight but was the result of a plan. The opinion in *Cantu* details that evidence, and we will not recount all of it here. Briefly summarized, the evidence reflected that Cantu was taken to the recreation area and shower out of turn on the day of the attack by Waltersdorf, one of the defendants, just after Waltersdorf had returned the attacker to his cell following recreation and a shower. There was no

---

[61] *Id.* at 843-44.

[62] *Id.* at 845.

[63] *Id.*

[64] *Id.* at 843-44.

[65] *Id.* at 843.

explanation of why Cantu was taken out of order.[66] The attacker's cell door was not securely closed by Waltersdorf when he returned the attacker to his cell. Waltersdorf then proceeded to Cantu's cell to take him to the recreation area.[67] As this was occurring, the attacker escaped from his cell. Cantu was on a floor below the attacker in another section of the prison that was separated by a wall. The attacker had to go through a door between these sections which was to have remained locked at all times but which, just minutes before the attack, had been left unlocked by Waltersdorf. A lighting system on a control panel in a control area would have shown officer Jones, the "picket officer," who was the third defendant, that the door between the sections in which Cantu and the attacker were housed was unlocked.[68] Jones testified that he did not notice the light, but in a handwritten statement just after the attack, he stated that he did notice that the door was unlocked but did not notify Waltersdorf.[69] There was also evidence that Waltersdorf's testimony that the attacker ceased slashing Cantu with a razor blade when Waltersdorf directed him to stop the attack was untrue. Others testified that the attack did not cease until another corrections officer arrived upon the scene. The case before us today is factually distinguishable from *Cantu*.

## IX

The dissent contends that the judgment against Hampton should be upheld based on a theory of liability that the plaintiffs have not urged at any point on appeal. Part I(C) of the dissenting opinion asserts that Hampton had a duty as yard officer to inspect the pens for weapons and breaches of security

---

[66] *Id.* at 842 & n.2.

[67] *Id.* at 841-42.

[68] *Id.* at 842.

[69] *Id.* at 842 n.3.

and that she did not perform those inspections on the day of the attacks.[70] This duty, the dissent contends, stems from a "post order" that the dissent says "provided that yard officers should inspect the pens before an inmate is placed inside."[71]   The dissenting opinion then selectively quotes testimony from Commissioner Epps and Hampton to support its assertion that there was an "evidentiary dispute" from which the jury could have concluded that Hampton's failure to inspect the pens amounted to deliberate indifference.

Not once, in any of the briefing before the three-judge panel of this court or subsequently the en banc court, have the plaintiffs suggested that Hampton had a duty to inspect the pens on the day of the attack and that she was deliberately indifferent for failing to do so.  Nor did the plaintiffs make such an argument in their briefing before the district court in response to Hampton's motion for judgment as a matter of law.  The plaintiffs did adduce testimony from an expert witness at trial to support such a theory, but their subsequent abandonment of that theory is explained by the lack of any evidence in the record to support the expert's bare assertion.

First and foremost, there is no evidence whatsoever that Hampton was aware of the existence of the "post order" at the time of the attacks.  She could not be deliberately indifferent to a duty stemming from an order of which she had no knowledge.  The "post order" was a 19-page document.  At trial, an expert witness for the plaintiffs read from page 11 of that document, stating that its provisions said "[u]pon removing the inmate from the exercise pen, the exercise pen shall again be inspected and searched.  The inmate shall be then – shall then be escorted back to the housing unit and secured inside his cell. . . . The inmate shall not be allowed to obtain any items from other offenders

---

[70] *Post* at 10-11.

[71] *Post* at 10-11.

during this process." In response to plaintiffs' counsel's statement that "[s]o the post order says, upon removal of the inmates from the pen, the pen shall again be inspected . . . [a]gain, implying that there should have been an inspection prior to placing the inmate in the pen" the expert said "[y]es, sir." The expert opined that since Hampton was a yard officer on the day of the attacks, this order applied to her and that she *implicitly* had a duty to inspect the pens *before* inmates were placed in them. However, there is no indication that Hampton knew of this order or that she had been informed by anyone that it was her duty to inspect the inside of pens to find any weapons that might be hidden in them on the day of the attacks.

The dissent points to Hampton's testimony that "'[m]y job was to go around the pens to make sure that [sic] wasn't nothing going on.'"[72] But this is not a statement that she thought that she was to go inside the pens, before or after prisoners were taken into them, to search for concealed weapons. Similarly, the dissent quotes Commissioner Epps entirely out of context in relying on Epps's testimony that "'[n]ormally, your pens is inspected by the individual who is out maintaining security at the pens.'"[73] The dissent says that this "implies that it was Hampton's job as the yard officer to do the inspection."[74] But the undisputed testimony from at least three witnesses at trial was that, for safety reasons, the policy that was in place and followed at the prison was that the officer who was in possession of the block gun was not to go into the exercise pens. The undisputed evidence was that Hampton complied with the policy that was actually in place at the prison regarding the yard officer in possession of block gun.

---

[72] *Post* at 11.

[73] *Post* at 11.

[74] *Post* at 11.

No. 12-60933

George Davenport, a correctional officer at the prison with the rank of captain at the time of the attacks, testified that Hampton could not have had a duty to search the pens "because she was the one that had the block gun, and with the block gun, you don't want to come in proximity of the inmates. Because if you go inside that pen trying to conduct a search, you've got another pen right next to it and one right behind it . . . ." Hampton similarly testified that when she had the block gun, she stayed outside the pens because an offender could easily dispossess her of the weapon. She said that she had the block gun when the prisoners were escorted into the yard on the day in question and, accordingly, it was not her job to search the pens. The evidence is also undisputed that at all times when Hampton was on duty in the yard on the day of the attacks, prisoners were being taken in and out of the exercise pens.

Artis Hobbs, the director of the Department of Corrections in Arkansas at the time of trial, testified as an expert witness on behalf of the defense. He explained that, pursuant to the American Correctional Association's standards, as the supervisor, Lieutenant Taylor or his designee—but not Sharon Hampton—was responsible for inspecting the pens on the day of the attacks. He also confirmed that, because Hampton was in possession of the block gun, her job was to "be as far away as she can be within range to effect a good shot if she have [sic] to use the block gun." Finally, he testified that, the text of the post order notwithstanding, it was not Hampton's responsibility to search the pens.

The plaintiffs' expert opined that Hampton's failure to inspect the pens on the day of the attacks amounted to deliberate indifference. But there was no evidence to support an inference that Hampton knew of any duty to inspect the pens while she was in possession of the block gun. For the reasons discussed above regarding expert testimony, the plaintiffs' expert's testimony

31

cannot establish Hampton's actual knowledge of a policy absent some evidentiary basis for her knowledge of the policy, nor can the expert's opinion be considered as evidence that Hampton knowingly violated such a policy, or that she subjectively appreciated a risk to inmates in violating such a policy. The district court erred in relying on the plaintiffs' expert testimony as evidence that Hampton's failure to inspect the pens could support the jury's finding of deliberate indifference.

The dissent interjects a theory of liability that the plaintiffs did not pursue in the district court in response to Hampton's motion for judgment as a matter of law, that the plaintiffs have been unwilling to embrace on appeal, and that finds no support in the record.

\* \* \*

For the reasons considered above, we REVERSE the district court's judgment against Hampton.

No. 12-60933

JENNIFER WALKER ELROD, Circuit Judge, joined by HAYNES and HIGGINSON, Circuit Judges, concurring in the judgment:

As reflected by the superb majority and dissenting opinions, the question of whether the record contains sufficient evidence to support a finding of deliberate indifference is a close and difficult one. In my view, this case can be resolved more easily by focusing on the issue of causation, as the evidence is insufficient to support a finding that Hampton's actions caused plaintiffs' injuries. Accordingly, I concur only in the judgment. *Cf. Salinas v. Texas*, 133 S. Ct. 2174, 2184 (2013) (Thomas, J., concurring in the judgment) ("I think there is a simpler way to resolve this case.").

## I.

In addition to proving that the defendant was deliberately indifferent, a plaintiff must prove that the defendant's deliberate indifference caused the plaintiff's injury. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) ("[P]laintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries."); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995) ("[D]eliberate indifference . . . must . . . have been the proximate cause of the plaintiffs' injuries . . . ." (internal quotation marks omitted)). Thus, in order to establish liability against Hampton, "the Plaintiffs must prove that [Hampton] set in motion events that would foreseeably cause the deprivation of Plaintiffs' constitutional rights." *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999). In my view, the record does not support the conclusion that Hampton's actions set the ensuing events into motion, and even if it did, liability still would not attach because Taylor's dropping the keys to the exercise pens was an unforeseeable, superseding cause of plaintiffs' injuries.

No. 12-60933

**A.**

The record in this case does not contain evidence that Hampton's actions set the ensuing events into motion. To the contrary, the evidence allows only the conclusion that the events in the exercise yard would have occurred regardless of whether Hampton supplied Taylor with extra ammunition for the block gun. The timeline is undisputed: (1) Hampton handed Taylor the block gun but not the ammunition; (2) two inmates escaped from their exercise pens and ran toward Taylor; (3) Taylor pointed the block gun at the inmates but did not attempt to fire it, dropped the keys to the exercise pen, and fled the yard; and (4) the inmates used the keys to release other inmates and then to access the plaintiffs' pens, where the attacks occurred.

These events followed one another in time, but chronology is not causation. As for the inmates, there is no evidence suggesting that the inmates knew Taylor was short on ammunition; thus, Hampton's actions played no role in their decision to launch an attack. As for Taylor, there is no evidence suggesting that he would not have abandoned his post if he had additional ammunition. In fact, the record contains a statement from Taylor in which he explains his reason for fleeing. Absent from that statement is any indication that he fled because he lacked ammunition for the block gun: "I raised the Block Gun and pointed in the direction of both inmates. Inmate Nash and Inmate Hayes hesitated and I, not knowing how many inmates were out, decided to run into the building. I admit that I panicked and somehow dropped the keys to the Exercise Pens." In other words, Taylor fled because he was afraid, not because he did not have two extra rounds of ammunition in his pocket. Taylor had no idea how many prisoners were on the loose, and he was not waiting around to do a head count and an assessment of his supply of rubber pellets.

34

No. 12-60933

The dissenting opinion states that "Taylor may have assumed the gun was loaded but realized that he had no extra ammunition, leaving him with at most one round to stop two armed inmates," but this speculation is inconsistent with Taylor's statement. Although the jury was free to make rational and supportable inferences from the record evidence, it was not permitted to engage in mere conjecture or to make unreasonable inferences. *See Huffman v. Union Pac. R.R.*, 675 F.3d 412, 426 (5th Cir. 2012) ("Jurors still may not simply guess."); *McConney v. City of Hous.*, 863 F.2d 1180, 1186 (5th Cir. 1989) ("[P]lainly unreasonable inferences or those which amount to mere speculation or conjecture do not suffice."); *Nichols Constr. Corp. v. Cessna Aircraft Co.*, 808 F.2d 340, 346 (5th Cir. 1985) ("Because of the requirement that the verdict be supported by *substantial* evidence, a verdict may not rest on speculation and conjecture.").

The record does not contain any evidence that Hampton's actions influenced either the inmates' or Taylor's actions. The only conclusion the record evidence permits is that the tragic events in the exercise yard would have played out the same way—with the inmates launching an attack and Taylor fleeing—regardless of whether Hampton had provided Taylor with the extra ammunition. Therefore, Hampton's failure to give Taylor ammunition did not set in motion the events leading to plaintiffs' injuries, and thus was not the cause of plaintiffs' injuries.[1]

---

[1] The district court cited two snippets of testimony that purportedly supported the jury's finding of causation. However, neither is on-point. The first piece of testimony is from Hampton herself; she testified that her failure to load the block gun "could have and it could not [have]" caused plaintiffs' injuries. This is a mere truism—anything "could have or could not have" played a role. It is not evidence that Hampton's acts actually did cause plaintiffs' injuries. Plaintiffs' counsel repeatedly sought a concession on causation from Hampton, but she did not oblige. The second piece of testimony is from plaintiffs' expert. Although plaintiffs' expert offered numerous opinions, he did not state that Hampton's failure to

No. 12-60933

## B.

Even assuming *arguendo* that Hampton's actions caused Taylor to flee, Hampton still would not be liable because Taylor's dropping the keys was an unforeseeable, superseding cause of plaintiffs' injuries. When the act of a third person "actively operates in producing harm to another after the [defendant's deliberately indifferent] act or omission has been committed," the third person's act is deemed an "intervening force." Restatement (Second) of Torts § 441 (1965).[2] If this "intervening force" is not a foreseeable result of the defendant's deliberate indifference, then the intervening force is a "superseding cause" and the defendant cannot be held liable for the resulting harm. *Id.* at § 440; *accord Murray v. Earle*, 405 F.3d 278, 290–91 (5th Cir. 2005). In this manner, the "superseding cause" doctrine cuts off the liability of an actor when the plaintiff's injury "was actually brought about by a later cause of independent origin that was not foreseeable." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (internal quotation marks omitted).

Here, it is undisputed that the escaped inmates could not have accessed the plaintiffs' pens without the keys that Taylor dropped. Therefore, Taylor's

---

provide Taylor with ammunition was a cause of plaintiff's injuries. He opined that Hampton's failure to inspect the pens constituted deliberate indifference, that Hampton's failure to end yard call in a timely fashion constituted deliberate indifference, and that Hampton's failure to check the block gun and to give Taylor ammunition for the block gun constituted deliberate indifference. He also testified that Hampton's failure to inspect the pens was a contributing cause of plaintiffs' injuries and that Hampton's failure to end yard call in a timely fashion was a contributing cause of plaintiffs' injuries. Plaintiffs' expert did not, however, testify that Hampton's failure to give ammunition to Taylor was a contributing cause of plaintiffs' injuries.

[2] Many of the cases and authorities discussing the "superseding cause" doctrine do so in the context of negligence, rather than deliberate indifference. The principle applies the same way in both contexts. *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 131 S. Ct. 1812, (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011).

dropping the keys was an intervening force that actively operated in producing harm to the plaintiffs. Whether Hampton can be held liable for plaintiffs' injuries, despite this intervening force, turns on whether the intervening force also was a "superseding cause"—*i.e.*, whether Taylor's dropping the keys was a foreseeable result of Hampton's failure to provide Taylor with ammunition. In my view, it was not foreseeable that Hampton's failure to provide Taylor with two rubber pellets would result in Taylor's handing over to the inmates the keys to the exercise pens.

To be sure, an intervening act of negligence—and Taylor's dropping the keys certainly was negligent—is not automatically a superseding cause that cuts off the liability of preceding actors. This is because even a negligent act can be foreseeable. *See, e.g.*, *Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1193 (5th Cir. 1978). To help draw the line between foreseeable and unforeseeable negligent acts by third parties, we have explained that an intervening negligent act is *not* a superseding cause if: (1) the defendant should have realized that the third person might act in the way he did; (2) "a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted;" or (3) "the intervening act is a normal consequence of a situation created by the [defendant's] conduct." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 372 (5th Cir. 2009) (internal quotation marks omitted); *see also* Restatement (Second) of Torts § 447; Prosser and Keeton, *The Law of Torts* § 44 (5th ed. 1984).

Taylor's dropping the keys does not fit into any of those three boxes. As for (1), although Hampton perhaps should have realized that a lack of ammunition could cause Taylor to flee, Hampton had no reason to believe that Taylor would drop the keys and allow the inmates to obtain them. As for (2),

No. 12-60933

a reasonable person would regard it as "highly extraordinary" that a prison guard abandoned the keys in a place the inmates could obtain them. As for (3), Taylor's dropping the keys is not the "normal consequence" of his being short on ammunition. Simply put, Hampton could not have foreseen that Taylor would respond to a crisis in the exercise yard by allowing the inmates to obtain the keys. Without the keys, the escaped inmates could not have injured the plaintiffs. Therefore, in my view, Taylor's act was an unforeseeable, superseding cause of plaintiffs' injuries, and Hampton cannot be held liable.

## II.

It is true that "[w]e accord great deference to the jury's verdict when evaluating the sufficiency of the evidence," *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000), and that we "are not to tamper lightly with the considered judgment of those drawn together at one point in time to render a judgment that is representative of the good common sense of the American people," *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) (internal quotation marks omitted). However, deferential review is not non-existent review, and we accordingly have reversed jury verdicts where the record is devoid of support for the jury's finding of causation. *See, e.g., Huffman*, 675 F.3d at 426; *Hill v. Anderson*, 420 F. App'x 427, 432 (5th Cir. 2011); *Nichols Constr. Corp.*, 808 F.2d at 347. Here, the causal link between Hampton's actions and the close-in-time assaults was severed not once, but twice. Hampton's failure to provide Taylor with ammunition did not influence the inmates' or Taylor's actions in any way, and even if it did, Taylor's dropping the keys was a superseding cause. Accordingly, I would reverse the judgment of the district court.

No. 12-60933

JAMES E. GRAVES, JR., Circuit Judge, joined by DENNIS, SOUTHWICK, and COSTA, Circuit Judges, dissenting:

The question in this case is whether there is sufficient evidence supporting the jury's verdict that prison guard Sharon Hampton was deliberately indifferent when she knowingly took multiple actions that created an obvious and substantial risk of attack and injury to the inmates she was charged with protecting. Were the majority the jury in this case, I would likely conclude that there was sufficient evidence to support its verdict. But because we are prohibited from substituting our own fact-finding for that of the jury, I would affirm the decision of the district court.

## I.

This is a fact-bound case in which we are called upon to review the sufficiency of the evidence supporting a jury finding of deliberate indifference under the Eighth Amendment. We review the district court's denial of a motion for judgment as a matter of law de novo. *Thomas v. Tex. Dept. of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000). "We accord great deference to the jury's verdict when evaluating the sufficiency of the evidence, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the verdict." *Id.* A motion for judgment as a matter of law should be granted only when "the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.* (quoting *Waymire v. Harris County, Texas*, 86 F.3d 424, 427 (5th Cir. 1996)). "If there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied." *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002) (internal alterations and quotation omitted).

No. 12-60933

There is no argument on appeal that the jury heard evidence it should not have heard or that any relevant evidence was excluded. There is no dispute that the jury was properly instructed about deliberate indifference and causation, as well as general principles such as direct and circumstantial evidence, credibility of witnesses, and the standard of proof. The district court reviewed all the evidence carefully at every stage of the case, eventually granting judgment as a matter of law to the second defendant on trial, George Davenport, while allowing the claim against Hampton to go to the jury. Post-verdict, the district court again carefully reviewed the evidence of deliberate indifference in denying Hampton's renewed motion for judgment as a matter of law. In reviewing the evidence of Hampton's acts and omissions, the district court concluded:

> Christopher Epps, Commissioner of the Department of Corrections, testified that on July 25, 2007, the date in question, Unit 32 was a dangerous place. Based on an investigation prompted by MDOC, Hampton was suspended for ten days for leaving the inmates on the yard beyond the allowable time, handing off an unloaded block gun on the yard, and taking the ammunition when she went inside the building after handing off the gun. Hampton acknowledged that on July 25, 2007, she did not inspect the pens, assumed the block gun was already loaded, and made a mistake in not checking the gun for ammunition. Larry Haefali, Plaintiffs' witness designated as a correctional practice and standards expert, opined that Hampton's failure to inspect the pens on the day in question was a violation of ACA Standards, the MDOC post order, and the standard of care. Moreover, Haefali testified that Hampton's violations amounted to deliberate indifference to the safety of Plaintiffs and was a contributing cause of Reed's death and the others' injuries.

The court then concluded that "Taking the facts in the light most favorable to the non-moving party, the jury had a legally sufficient evidentiary basis to find for the Plaintiffs." Because I agree with the district court, I would affirm.

40

No. 12-60933

## A.

Hampton first argues, and the majority agrees, that there was insufficient evidence that she was deliberately indifferent.  Hampton argues that there is insufficient evidence to support the jury's verdict that by failing to check if the block gun was loaded and knowingly taking the ammunition for the gun with her and leaving an improperly armed guard on the yard, she disregarded a substantial risk of harm to the inmates.  She argues that, at most, she was negligent. Hampton also argues that the risk of harm from inmate attacks at Unit 32 was too generalized to have alerted her to the risk of leaving Taylor without the additional ammunition when she left the yard.

"It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006); *see Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).  "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, and having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 834 (internal alterations, quotations and citations omitted).  To prevail on their claims against Hampton, Plaintiffs were required to demonstrate two things: that they were "incarcerated under conditions posing a substantial risk of serious harm," and that Hampton was deliberately indifferent to that risk. *Id.*

A prison official is deliberately indifferent when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  Deliberate indifference thus requires the official's subjective

41

awareness of risk; it is not enough that a reasonable official should have known of the risk. *See id.* at 837-38.  However, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" or "from the very fact that the risk was obvious." *Id.* at 842.  With regard to inmate-on-inmate attacks, *Farmer* specifically holds that if a substantial risk of inmate-on-inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it," then a jury could reasonably conclude that the official "had actual knowledge of the risk." *Id.* at 842-43 (quotation omitted).

The evidence presented at trial was more than sufficient for a reasonable jury to find that Hampton knew that leaving an under-armed guard on the yard created a substantial and obvious risk of inmate-on-inmate attacks and that Hampton deliberately disregarded that risk when she decided to do it anyway.  The evidence establishes that Unit 32 was not a typical unit in a typical prison, but was designated to hold some of the most dangerous inmates in the Mississippi prison system, including rival gang members, inmates that were too violent to be in the general population, and inmates who had committed serious rule violations.  Then-MDOC Commissioner Christopher Epps testified and described a culture of pervasive violence and even employee corruption, and an environment in Unit 32 where weapons were readily available, fighting and stabbing were frequent and murders were not uncommon.  Epps testified that the pens were constructed specifically because of the prevalence of fighting and stabbings in the yard.  He testified that it was known that inmates made weapons out of anything, including making shanks

out of the pens themselves, and that officials knew of the possibility that inmates had placed weapons in their pens, or even that guards had placed weapons there for the inmates.  Epps also testified that less than a month prior to the incident, a guard affiliated with a gang had smuggled a gun to inmates inside Unit 32, which was to be used to kill rival gang members, further highlighting the pervasive danger of inmate-on-inmate violence in Unit 32.  He testified that this previous incident "contributes, in my professional opinion, to this - - why we're here today."  Epps told the jury that "the facts are, gang in, gang out, blood in, blood out. When you join, you join knowing that your life is put on the line. And the facts are, we can blow all of the hype for the jury and make all the nice statements and speeches, but at the end of the day, the incident was going to happen either on the pens or somewhere else."

Additional evidence described the explosive conditions at Unit 32 and further supported Epps' testimony regarding the known substantial risk of inmate-on-inmate violence.  Ricky Scott, a gang specialist for MDOC, testified that Reed, Williams, and Bynum had been attacked pursuant to an ongoing "war" between rival gangs, and that inmates would try "to beat the security whichever way they can" in order to attack other inmates.  Lawrence Haefeli, Plaintiffs' expert in corrections, explained several specific factors that gave rise to a particularly dangerous situation in Unit 32 at the time of the incident, including that the unit housed gang members, inmates too violent to be in the general population, and mentally ill inmates, and that the prison's classification system, which did not allow inmates to work their way out of segregation, created a "desperate" situation for inmates.

This evidence, including testimony from the Commissioner of the Department, portrays a brutal and violent unit where the substantial risk of inmate-on-inmate violence, especially in the yard, was "longstanding,

pervasive, [and] well-documented," and was particularly heightened around the time of the attack on the Plaintiffs. The jury could reasonably have concluded that Hampton must have been aware of the risk of attacks in the yard. *Farmer*, 511 U.S. at 842-43.

The majority asserts that the jury could not impute Epps' knowledge of the exceedingly violent and explosive nature of Unit 32, including past violent incidents in the yard, to Hampton, an eight-year veteran of MDOC. The majority substitutes its own judgment for that of the jury. The majority apparently would conclude that only Hampton's acknowledgment that she was aware of a substantial risk would suffice. Yet it is clear that direct evidence regarding Hampton's subjective state of mind is not required, so long as the risk was sufficiently obvious. *Farmer*, 511 U.S. at 842. Further, *Farmer* provides that, even if there is sufficient evidence that a risk was obvious, "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Id.* at 844. Thus, Hampton could have produced evidence that even though the risk of inmate-on-inmate attacks on the yard was obvious, she was in fact not subjectively aware of it. She did not. The evidence that was presented was more than sufficient to allow the jury to find that the risk was obvious and that an experienced guard working in the unit must have known of it.

The evidence further shows that Hampton consciously and knowingly made multiple decisions that disregarded the obvious risk of harm from inmate-on-inmate attacks on the yard at Unit 32. It is undisputed that Hampton never checked that the block gun was loaded after she received it from Taylor, despite evidence showing that it was her duty to check the gun upon receiving it, and despite being the officer on duty in the yard for multiple hours that day. It was a disputed question whether Hampton could or should

have checked the gun during yard call, but resolution of that dispute is a quintessential jury question.  It is undisputed that Hampton decided to go inside to retrieve a form for an inmate who said he would not leave the yard unless she did.  It is undisputed that Hampton knowingly took the two additional rounds of ammunition inside with her, although she knew that prison policy required her to leave them with Taylor when she gave him the block gun.  Hampton testified that "I handed Lieutenant Taylor the gun and the keys, and thinking that I'm going to come back out in less than a minute or two, I took the rounds with me."  She did not simply forget about the ammunition; she thought about her actions and decided to do it anyway, knowingly leaving an under-armed guard on the yard.  Although Hampton testified that she intended to be inside for "less than a minute or two," she was actually gone for at least five to six minutes, when the attack began and she was still inside with the ammunition.  In a situation as volatile as the one that existed in Unit 32 at the time, with a past history of serious inmate violence in the yard, the jury was entitled to find that knowingly leaving a guard without sufficient ammunition, and thus without the necessary means to keep order and defend himself or other inmates, was deliberately indifferent to an obvious risk of harm.

In addition, Plaintiffs' expert in corrections testified to his conclusion that Hampton's actions both violated the correctional standards followed by MDOC and amounted to deliberate indifference.  The majority's discussion of whether the expert's opinion alone could create a fact issue is utterly irrelevant to this case; Haefeli's expert opinion was one piece of evidence among others that allowed the jury to reach the verdict that it did.  Haefeli testified that his opinion was based on documents and evidence related to the incident, including MDOC's internal investigative report, post orders for officers at Unit

32, Defendants' discovery responses, Epps' deposition and trial testimony, Davenport's deposition and trial testimony, and Hampton's own deposition and trial testimony, which he referenced and explained to the jury, including explaining how Hampton's actions deviated from the post order for yard officers and how her own admitted failures violated correctional standards. *See Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th Cir. 2010) ("An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone." (quotation omitted)). Haefeli's ultimate conclusion that Hampton was deliberately indifferent was based, in part, on Hampton's own deposition testimony that she knew the ammunition was important because, absent ammunition for the block gun, there was no way to protect the inmates or other officers from an attack. Though the expert was permitted to testify to the ultimate issue of deliberate indifference—without objection from Hampton—it was not necessary for him to do so in order to create a fact issue for the jury regarding Hampton's deliberate indifference.

Further, Hampton was disciplined and suspended for ten days because her failing to check the block gun and taking the ammunition inside with her constituted rule violations involving a threat to human life or safety. While the discipline standing alone could not be dispositive proof that Hampton was deliberately indifferent, Hampton's failure to follow protocols put in place for the safety of guards and inmates is certainly a relevant fact that the jury was entitled to take into account. Of course, not every mistake or protocol violation by a prison guard becomes deliberate indifference simply because prisons are dangerous. If an officer acts or responds reasonably in a situation involving a risk of inmate-on-inmate attack, there will be no liability, even if the harm is not averted. *Farmer*, 511 U.S. at 844. Even if an officer acts without the due

care a reasonable person would use, such that the officer is only negligent, there will be no liability. *See Davidson v. Cannon*, 474 U.S. 344, 347 (1986).

Here, the record is replete with evidence allowing the jury to find that leaving Taylor with insufficient ammunition created a substantial and obvious risk of inmate-on-inmate violence in the yard, and that Hampton knowingly took several actions that showed deliberate disregard of that risk.

**B.**

Hampton argues, essentially, that the jury could not find that she was aware of a risk of harm unless an identical incident in which inmates broke out of their pens had previously occurred. But *Farmer* makes clear that a prison official need not anticipate the specific way an attack will unfold in order for that risk to be substantial enough to incur liability. *Farmer* provides:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Farmer*, 511 U.S. at 843. For example, in *Cantu v. Jones*, we upheld a jury verdict of deliberate indifference against defendant prison officials, even though the case "involve[d] an extraordinary set of circumstances" that led to inmates attacking other inmates. 293 F.3d at 844-45.

Similarly, in *Hernandez ex rel. Hernandez v. Texas Department of Protective & Regulatory Services*, a due process case, we held that "[a]lthough

47

deliberate indifference is determined by a subjective standard of recklessness, this court has never required state officials to be warned of a specific danger." 380 F.3d 872, 881 (5th Cir. 2004) (internal citation omitted).  In *Hernandez*, the defendant government officials argued that they could not be held liable for the suffocation of a child in foster care, because there was no evidence that they had actual knowledge that placing the child with the foster parents entailed a "specific danger of the particular injury of suffocation" and "deliberate indifference requires actual knowledge of suffocation."  *Id.*  We rejected that argument, and explained that to hold otherwise "would be inapposite with" *Farmer.  Id.* at 881-82.  Instead, we held that "the central inquiry" was "whether the state social workers were aware of facts from which the inference could be drawn, that placing children in the . . . foster home created a substantial risk of danger.  We need not address the form that such a risk might eventually manifest."  *Id.* at 882.  We concluded that "a state official may not escape deliberate indifference liability . . . by contending that the particular method of harm, i.e. how the abuse was carried out, was not envisioned."  *Id.*; *see also Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur."); *Haley v. Gross*, 86 F.3d 630, 643 n.33 (7th Cir. 1996) ("Sergeant Ellis and Superintendent Gross are no less liable for deliberate indifference because, while they knew that Wilborn presented a substantial risk of serious harm to Haley, they may not have envisioned that Wilborn would light the cell on fire.").

The evidence was sufficient for the jury to find that leaving insufficient ammunition for Taylor to use in the event of a security breach created a substantial and obvious risk of harm from inmates attacking other inmates in

No. 12-60933

the yard. The Plaintiffs were not required to show that Hampton knew precisely how such an attack might unfold.

**C.**

In addition, although the focus of this appeal has become Hampton's actions with regard to the two rubber bullets for the block gun, the jury actually heard evidence regarding additional failures by Hampton which the jury could have found constituted deliberate indifference. The district court expressly relied on this evidence in denying judgment as a matter of law. Specifically, at trial, the Plaintiffs produced evidence that it was Hampton's duty as yard officer to inspect the pens, and that she did not. While Hampton and Epps vehemently contested whether it was Hampton's duty to inspect the pens that day, the Plaintiffs presented evidence that would support a finding that it was. Plaintiffs presented a "post order," which is a description of duties, for yard officers, which provided that yard officers should inspect the pens before an inmate is placed inside. Hampton testified that her post that day was as the yard officer, and that "My job was to go around the pens to make sure that [sic] wasn't nothing going on." Epps testified that "Normally, your pens is inspected by the individual who is out maintaining security at the pens," which implies that it was Hampton's job as the yard officer to do the inspection. Epps testified that it was known that inmates made weapons out of the pens, or had weapons placed inside the pens by someone else. Indeed, multiple perpetrators of the attack were able to acquire weapons by storing them in the pens or having them placed in their pens by someone else. Inmate Hayes testified that there were "weapons waiting on me" in the pen and that he knew the guards did not check the pen before he was placed inside it. Inmate House testified that he also had weapons waiting in his pen, placed there by other inmates the day before.

49

No. 12-60933

Thus, there was evidence that the jury could have believed that it was Hampton's duty to inspect the pens, and that she failed to do so, which was deliberately indifferent to an obvious risk that the inmates might smuggle weapons into the pens or use something in the pen as a weapon against other inmates. This type of evidentiary dispute is unquestionably for the jury to resolve.

## II.

Hampton also argues that there is insufficient evidence supporting the conclusion that her actions were the cause of Plaintiffs' injuries. She argues that Taylor's failure to fire the block gun and his dropping the keys to the pens were the only causes of the harm to the Plaintiffs.

"We begin with the obvious proposition that the question of causation is 'intensely factual.'" *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999) (quoting *Savidge v. Fincannon*, 836 F.2d 898, 905 (5th Cir. 1988)). We have held that the proximate causation requirement in § 1983 cases is satisfied with proof that the defendant "set in motion events that would foreseeably cause the deprivation of Plaintiffs' constitutional rights." *Id.* at 672.

This jury was not armed with the law of causation that is now being applied by the concurring opinion. With regard to causation, the jury was instructed only that:

> [T]he Plaintiffs have the burden to identify the Defendant or Defendants who are either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.
>
> If you find that Defendant Sharon Hampton had no personal or direct involvement, or was not causally connected to the incident, then you should return a verdict for the Defendant Sharon Hampton.

No. 12-60933

Hampton proposed this instruction. The jury was not instructed on actual causation, proximate causation or supervening causes. Hampton never proposed any such instruction and has never argued that the jury instructions were deficient. Nor did Hampton assert causation as a basis for judgment as a matter of law at any time before submission of the case to the jury.

Hence, there was sufficient evidence to support the jury's finding that Hampton's actions were causally connected to the Plaintiffs' injuries. The evidence is clear that, at first, only two inmates escaped, and there is undisputed testimony from both Williams and Bynum that the two escaped inmates stopped when Taylor pointed the gun at them. They only continued to advance after he lowered the gun and instead retreated. While there is not clear evidence of Taylor's reasons for retreating,[1] it is an obvious inference that he knew or realized that Hampton had not handed him the bullets when she handed him the gun. Taylor may have assumed the gun was loaded but realized that he had no extra ammunition, leaving him with at most one round to stop two armed inmates. It is a logical inference that if he had the additional rounds—that is, the number of rounds the Department had determined is adequate to keep with the block gun—he might have been able to dissuade the inmates from continuing with their attack or to hold them at bay until he could radio for additional officers to assist. The Plaintiffs' expert at trial testified that Hampton's failure to provide ammunition for the block gun and failure to inspect the pens were contributing causes of the Plaintiffs' injuries. Further, while Hampton might not have anticipated that Taylor would specifically drop

[1] The concurring opinion points to Taylor's unsigned statement to MDOC investigators that "not knowing how many inmates were out, I decided to run inside the building" as evidence of the reason for Taylor's flight. When asked to swear that it was the truth, Taylor specifically refused to sign the statement during the investigation. Taylor was subsequently disciplined for making false statements during the investigation.

No. 12-60933

the keys, Taylor's panic and inability to control the situation are the natural and probable consequences of leaving an insufficiently-armed guard on the yard. Taylor dropping the keys is not an independent, unforeseeable event that breaks the chain of causation, but the result of the out-of-control situation that predictably resulted from Hampton effectively disabling the primary tool at the guard's disposal to control the yard.

These are all inferences from the evidence that are within the province of the jury to make, particularly given the abbreviated guidance the jury received on the causation issue. There is no basis to reverse the jury verdict that Hampton's deliberate indifference caused the injuries to the Plaintiffs.

## III.

Lastly, I note that this is not a qualified immunity case. Hampton pleaded the affirmative defense of qualified immunity in her answer, but she never moved for summary judgment based on qualified immunity, she did not mention qualified immunity in her motion for judgment as a matter of law, and she made only thinly-briefed arguments regarding qualified immunity in her initial panel briefs. She did not even mention qualified immunity in her supplemental en banc brief. Thus, qualified immunity could not be grounds for reversal.

## IV.

This case comes to us on appeal after a jury verdict and involves fact-intensive issues. After hearing the evidence of multiple failures by Hampton, and the obvious risk of inmate-on-inmate attacks at Unit 32, a reasonable juror could have found that Hampton's actions were deliberately indifferent to a substantial risk of harm and caused the Plaintiffs' injuries. The district court's decision that the jury verdict is compatible with the law and the evidence in the record should be affirmed. I therefore dissent.